BRIAN J. STRETCH (CABN 163973)
Acting United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

WILLIAM FRENTZEN (LABN 24421)
SUSAN BADGER (CABN 124365)
S. WAQAR HASIB (CABN 234818)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6959
    FAX: (415) 436-6753
    william.frentzen@usdoj.gov
    susan.badger@usdoj.gov
    waqar.hasib@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 14-0196 CRB |
| Plaintiff, | |
| v. | UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO BAR ANONYMOUS WITNESSES AND COMPEL DISCLOSURE OF THE TRUE IDENTITIES OF GOVERNMENT WITNESSES |
| KWOK CHEUNG CHOW, et. al. | |
| Defendants. | Hearing date: To be determined by Court[1] <br> Trial date: November 2, 2015 |

---

[1] As discussed in further detail below, the Court does not appear to be available on October 14, 2015, the date for which CHOW noticed his motion. The United States maintains that no hearing is necessary to resolve CHOW's motion, but if the Court finds otherwise, the United States will be prepared to argue on whatever date is convenient for the Court.

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................. 1

II. CHOW'S MOTION SHOULD BE DISMISSED AS MOOT ................................................... 1

III. THE LAW ON CONFRONTATION OF WITNESSES ........................................................... 2

IV. ARGUMENT ....................................................................................................................... 7

   A. CHOW Is Entitled To Portray An Unflattering Image of the UCEs, But CHOW Does Not Need the UCEs' True Identities To Do So ........................................................................ 7

   B. The United States has Presented Credible Evidence That Revealing the UCEs' Identities Will Place Them In Danger, And Is Not Required To Present Such Evidence To The Defendants ... 9

   C. This is Not a *Brady* Issue ............................................................................................... 12

   D. Disclosure of the UCE's True Identities to the Public is Not Inevitable ................................ 13

V. CONCLUSION .................................................................................................................. 13

# TABLE OF AUTHORITIES

## FEDERAL AND STATE CASES

*Alford v. United States*,
 282 U.S. 687, 694 (1931) ........................................................................................... 8

*Alvarado v. Superior Court*,
 23 Cal.4th 1121 (2000) ............................................................................................. 6

*Brown v. Kuhlman*,
 142 F.3d 529 (2nd Cir. 1998) .................................................................................... 4

*Delaware v. Fensterer*,
 474 U.S. 15 (1985) .................................................................................................... 2

*Delaware v. Van Arsdall*,
 475 U.S. 673 (1986) .............................................................................................. 2, 9

*Gonzalez v. Quinones*,
 311 F.3d 735 (2nd Cir. 2000) .................................................................................... 4

*Maryland v. Craig*,
 497 U.S. 836 (1990) .................................................................................................. 2

*Siegfriedt v. Fair*,
 982 F.2d 14 (1st Cir.1992) ........................................................................................ 3

*Smith v. Illinois*,
 390 U.S. 129 (1968) .................................................................................................. 2

*United States v. Celis*,
 608 F.3d 818 .......................................................................................................... 12

*United States v. Cosby*,
 500 F.2d 405 (9th Cir. 1974) .................................................................................... 2

*United States v. Ellis*,
 468 F.2d 638 (9th Cir. 1972) ................................................................................ 3, 4

*United States v. Falsia*,
 724 F.2d 1339 (9th Cir. 1983) .................................................................................. 2

*United States v. Fuentes*,
 988 F.Supp. 861 (E.D.Pa.1997) ................................................................................ 5

*United States v. Gutierrez de Lopez*,
 761 F.3d 1123 (10th Cir. 2014) ................................................................................ 3

*United States v. Lucas*,
 932 F.2d 1210 ........................................................................................................... 4

*United States v. Mohamud*,
 941 F.Supp. 2d 1303 (D. Oregon 2013) ................................................................... 3

*United States v. Palermo*,
  410 F.2d 468 (7th Cir. 1969) .................................................................................... 3, 12

*United States v. Ramos-Cruz*,
  667 F.3d 487 (4th Cir. 2012) ........................................................................................ 3

*United States v. Ramos-Cruz,*,
  667 F.3d 478 (4th Cir. 2012) ...................................................................................... 12

*United States v. Rangel*,
  534 F.2d 147 (9th Cir. 1976) ........................................................................................ 3

**STATUTES**

18 U.S.C. § 2518 ................................................................................................................ 7

## I. INTRODUCTION

Defendant Kwok Cheung CHOW has filed a motion to bar anonymous witnesses and to compel the disclosure of the true identities of undercover employees (UCEs) of the Federal Bureau of Investigation who are anticipated to testify in this case. As described in further detail below, CHOW's motion should be dismissed as moot. Even if the Court reaches the merits, though, CHOW misunderstands the applicable law regarding confrontation of witnesses. In particular, he offers no explanation why he cannot conduct effective cross-examination of the UCEs without knowing their true identities. He also mischaracterizes this issue as a *Brady* issue, and incorrectly assumes that disclosure is inevitable. For all of these reasons, his motion should be denied in its entirety.

## II. CHOW'S MOTION SHOULD BE DISMISSED AS MOOT

On September 25, 2015, the day after CHOW filed the instant motion, the United States filed an *ex parte*, *in camera* sealed motion pursuant to Section 4 of the Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. III, § 4, together with a public notice that it had made such a filing, and a public proposed order granting the relief sought in the sealed motion: specifically, authorization for the United States to withhold from discovery information that could be reasonably expected to reveal the true identities of two[2] UCEs. Docket No. 1036. On October 2, 2015, while the United States was preparing its response to the instant motion by CHOW, the Court granted the United States' proposed order. Docket No. 1047. In light of that order, CHOW's motion to compel discovery of the UCEs' true identities should be dismissed as moot.[3]

---

[2] The two UCEs who were the subject of the United States' *ex parte*, *in camera* sealed motion are expected to testify at trial. There a number of other UCEs who participated in the investigation only peripherally. The parties are currently discussing whether they will be able to stipulate as to the testimony of those peripheral UCEs.

[3] In addition to dismissing as moot, this Court could also conceivably dismiss CHOW's motion as untimely. CHOW filed his motion on September 24, 2015. This was nine days after the Court advised CHOW during a severance hearing that if CHOW wanted to join any of his severed co-defendants' motions for purposes of his trial, he would have to refile the motions under his own name. The instant motion filed by CHOW appears to be virtually identical to an earlier motion filed by co-defendant Leslie YUN (Docket No. 1035), other than cosmetic changes to the font, the deletion of several footnotes, and the addition of a declaration by CHOW's counsel. CHOW has offered no reason why it took him nine days to essentially copy YUN's motion verbatim and refile it under his own name. In addition, CHOW filed his motion without consulting with either the Court or counsel for the United States about scheduling, then refiled it again on September 28, 2015, again without consulting about scheduling. Exhibit 1. Notably, CHOW has selected October 14, 2015, as the hearing date for his motion, a date on which the Court appears to be unavailable. Regrettably, this is only the most recent in a long string of pleadings that CHOW has filed haphazardly, in violation of scheduling agreements and deadlines. *See, e.g. Defendant's Pretrial Memorandum In Preparation for Pretrial Conference on September 28, 2015*, Docket No. 1039(filed 2.5 hours prior to pretrial conference on September 28, 2015, in violation of Local Rule 17.1(b), which requires filing no later

1    Even if the Court reached the merits, though, the motion is still baseless. Below the United States
2 explains the relevant law on confrontation of witnesses, and demonstrates why each of the four
3 arguments raised in CHOW's motion are baseless.

**III.    THE LAW ON CONFRONTATION OF WITNESSES**

5    The Confrontation Clause of the Sixth Amendment provides that the defendant in a criminal trial
6 has the right to confront and cross-examine the government's witnesses who testify against him. *See*
7 *Maryland v. Craig*, 497 U.S. 836, 846 (1990); *Smith v. Illinois*, 390 U.S. 129 (1968). The "elements of
8 confrontation – physical presence, oath, cross-examination, and observation of demeanor by the trier or
9 fact – serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an
10 accused is reliable and subject to rigorous adversarial testing that is the norm of Anglo-American
11 criminal proceedings." *Craig*, 497 U.S. at 846. "The rule is that once cross-examination reveals
12 sufficient information to appraise the witnesses' veracity, confrontation demands are satisfied." *United*
13 *States v. Falsia*, 724 F.2d 1339, 1343 (9th Cir. 1983).

14    The Confrontation Clause has its limits.  It "guarantees an opportunity for effective cross-
15 examination, not cross-examination that is effective in whatever way, and to whatever extent, the
16 defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986), *quoting Delaware v.*
17 *Fensterer*, 474 U.S. 15, 20 (1985)(emphasis in original removed).  While in most circumstances the
18 Confrontation Clause requires that a trial witness be identified by his true name, *Smith*, 390 U.S. 129 at
19 131-132, the Confrontation Clause "does not establish a rigid rule of disclosure, but rather discusses
20 disclosure against a background of factors weighing conversely, such as personal safety of the witness."
21 *United States v. Cosby*, 500 F.2d 405, 406 (9th Cir. 1974), *citing Smith*.   Trial judges retain wide
22 latitude to impose reasonable limits on cross-examinations based on concerns about, among other things,

---

than 7 days before pretrial conference); *Defendant's Reply to Response to Motion In Limine to Exclude All References to Past Acts And Charges of Racketeering*, Docket No. 1037 (filed on September 26, 2015, after September 22, 2015 deadline agreed upon by parties); *United States' Notice Re Defendant Chow's Response and Opposition to Government's Motions In Limine*, Docket No. 1034(describing other delayed filings by CHOW); *United States' Motion To Re-Schedule Motions Hearing Dates and Proposed Order,* Docket No. 944(describing other delayed filings by CHOW). Nonetheless, because CHOW's motion can be dismissed both on the merits and for mootness, the United States does not press the issue of untimeliness.

2

"harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679.

Several circuits, including the Ninth Circuit, have concluded that it is appropriate for witnesses to use a pseudonym, where the government's interests in protecting the witness from harm outweighs the defendants' interests in learning the true name of the witness. *See United States v. Rangel*, 534 F.2d 147 (9th Cir. 1976) (permitting testimony by informant without disclosing his true name); *Siegfriedt v. Fair*, 982 F.2d 14, 18 (1st Cir.1992); *United States v. Ramos-Cruz*, 667 F.3d 487 (4th Cir. 2012)(allowing two El Salvadorian witnesses to testify anonymously about general information about operation of MS-13 street gang); *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969) (finding "where there is a threat to the life of the witness the right of the defendant to have the witness' true name, address and place of employment is not absolute"); *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1138-49 (10th Cir.), *cert. denied*, 135 S.Ct. 768 (2014)(approving of witnesses who testified anonymously where defendant was able to effectively cross-examine them, and finding that government's failure to demonstrate specific threat of witness safety was harmless error).[4]

Several circuits, including the Ninth, have specifically approved of the use of pseudonyms by testifying undercover law enforcement agents, who often bring with them to the witness stand unique safety concerns. *United States v. Ellis*, 468 F.2d 638 (9th Cir. 1972) (affirming decision to prohibit cross-examination on undercover agent's name and address where there were "substantial reasons" for withholding the information and relevance of the undercover agent's personal history was "questionable"); *United States v. Mohamud*, 941 F.Supp. 2d 1303 (D. Oregon 2013) (holding that non-

---

[4] *Gutierrez de Lopez* is particularly instructive. There, the Tenth Circuit found that government witnesses could testify under pseudonyms if 1) the government could demonstrate a threat to the witness's safety, and 2) the lack of the witness's true identity did not deprive the defendant of an opportunity for effective cross-examination. With regard to the second prong, the Court noted that one way to allow for effective cross-examination was to give the witness's true identity to counsel for investigative purposes while still allowing the witness to testify under a pseudonym, "but this is not the only means to do so…. Even when the government has not disclosed witnesses' true identities to defense counsel, several circuits have concluded defendants were not deprived of an opportunity for effective cross-examination." *Gutierrez de Lopez*, 761 F.3d at 1142 (citing several cases). On the facts before it, the Court found that the government had failed to demonstrate a specific threat to its anonymous witnesses' safety, but that any error was harmless because the defendants were able to effectively cross-examine the witnesses about among other things, their prior arrests and their compensation for acting as informants. *Id.* at 1147.

3

disclosure of undercover witnesses' true names and permitting them to testify using pseudonyms did not entitle defendant to a new trial because defense was able to conduct meaningful cross-examination); *see also Brown v. Kuhlman*, 142 F.3d 529, 532 n.3 (2nd Cir. 1998); *United States v. Urena*, 8 F.Supp.3d 568 (S.D.N.Y. 2014). Other courts have also approved of the use of disguises and other concealment mechanisms to protect the identity of undercover agents at trial, while still allowing defendants the ability to meaningfully cross-examine them in public. *See*, *e.g.*, *United States v. Lucas*, 932 F.2d 1210, 1216-17 (8th Cir.), *cert. denied*, 502 U.S. 869 (1991). Still others have approved of even stricter measures to protect the identity of undercover agents, such as sealing a courtroom. *See*, *e.g.*, *Gonzalez v. Quinones*, 311 F.3d 735, 738 (2nd Cir. 2000).

CHOW dismisses these cases as irrelevant, despite their clear holdings. For instance, in *Ellis*, the Ninth Circuit approved of an undercover testifying at trial without being required to reveal his true name on cross-examination. CHOW is correct that the Ninth Circuit reasoned that the use of a pseudonym was appropriate because the witness's testimony was of "marginal significance." But the Court also distinguished *Smith*, upon which CHOW relies heavily, reasoning that in *Smith* the prosecution "gave no reasons which might have justified the refusal to disclose the agent's name and address." *Id.* In contrast, in *Ellis*, as is the case here, "the prosecution represented to the Court substantial reasons for withholding information to protect the agent from harm." *Ellis,* 468 F.2d at 639. Moreover, the undercover agent's testimony in *Ellis* was corroborated by other evidence, as is the case here, where virtually every interaction that undercover agents had with CHOW was recorded on audio and/or video. Finally, the *Ellis* court reasoned that the relevance of the personal history of the undercover agent was questionable. *Id.* So too is the case here.

CHOW also dismisses the relevance of *Mohamud*, claiming that the "extended bacchanalian investigation here had nothing to do with national security." CHOW's allegation that this investigation was nothing more than a wine tasting extravaganza is unfounded, to say the least: he entirely ignores that over the course of the investigation the government purchased dozens of dangerous firearms, exposed the corrupt activities of a state senator who has since pled guilty to racketeering charges, and potentially solved two murders. More importantly, though, with respect to the claim that this case had nothing to do with national security, CHOW entirely ignores the final transaction that led to the

4

culmination of this investigation. In that transaction, several defendants agreed to supply an undercover agent with large shipments of weapons, including shoulder-fired missiles, initially from a purported Russian arms trafficker, and then from an arms trafficker purportedly connected to members of the Filipino military who in turn were connected with armed Muslim rebel groups in the Philippines. Additional details regarding the national security implications of this case were addressed in the United States' *ex parte in camera* sealed filing.

The cases that CHOW relies on in his motion do not aid his cause. For example, CHOW cites a 1997 opinion from the Eastern District of Pennsylvania, *United States v. Fuentes*, 988 F.Supp. 861 (E.D.Pa.1997). But in *Fuentes* the court actually held that it *would* allow a DEA informant to testify under a pseudonym ("[w]e do not believe… that the Confrontation Clause requires that Lozano[5] reveal his true identity in open court.") *Id.* at 867. Thus, the only issue in *Fuentes* that is germane to this case is whether the defense team should be granted access to UCEs' true names prior to trial solely for investigatory purposes. The court in *Fuentes* allowed such access, but also "strictly limited" dissemination of the informant's identity to counsel and one investigator, and warned that any further dissemination for purposes other than investigating the informant's background would be punishable by contempt of court. In other words, *Fuentes* struck a reasonable middle ground, allowing the witness to testify under a pseudonym, while allowing the defendant strictly limited access to the witness's true identity for investigative purposes only, with any misuse to be punished with contempt of court. Here, the reasonable middle ground of *Fuentes* is simply not a realistic alternative. Counsel for CHOW vigorously objected to the Court's issuance of a protective order governing discovery because it would inhibit his ability to present his case to the media.[6] Since then, counsel for CHOW has violated not only

---

[5] Lozano was the witness's cover name.

[6] See Raymond Chow's Opposition to Motion for a Protective Order, Docket No. 292, in which counsel for CHOW complained that protective orders limiting disclosure of discovery were "depriving Mr. Chow the ability to disseminate information to the public." Counsel argued that "[t]here is no time in a person's life when the First Amendment is more critical than when facing criminal accusations. The less money and resources a person has, the more important the First Amendment is in proving his innocence. This is especially true in the case of Mr. Chow, who has been victimized and targeted by the federal government with unbridled enthusiasm, and a seemingly unending supply of undercover agents, tax-payer funds, and resources, in stripping him of his freedom. The First Amendment is also critical to the press and the public in ensuring government accountability in the modern day era of endemic electronic surveillance, personal intrusions, and rampant, well-documented government abuse of

the protective order that this Court ultimately issued, but this Court's wiretap sealing orders, as well as the Federal Rules of Criminal Procedure regarding the public filing of personal identifying information.[7] Counsel for CHOW has also apparently identified photographs of one person he believes to be a UCE to reporters for the San Francisco Chronicle.[8]  As a result, there can be no illusions about what counsel for CHOW will do with the UCEs' true identities if he obtains them: he will immediately broadcast them to the general public.  In short, the reasonable middle ground struck in *Fuentes* is not realistic here.

CHOW also relies heavily on *Alvarado v. Superior Court*, 23 Cal.4th 1121 (2000), but that case, which of course is not binding on this Court, is distinguishable for a number of reasons.  First, the witnesses at issue were not undercover agents, but rather three jailhouse informants who observed the murder of a fellow inmate.  The prosecution's case relied in large part on the testimony of these three informants, whose observations were apparently not recorded in any way (unlike this case, where virtually every interaction by UCEs with the defendants was captured on audio and/or video).

Most importantly, though, the California Supreme Court held that the Confrontation Clause required the prosecution to disclose the true identities of the three informants because otherwise, the defendant would not be able to effectively cross-examine them.  Here, as discussed in further detail below, there can be no serious claim by CHOW that he will be unable to effectively cross-examine the UCEs. Indeed, in many ways, his attack on their credibility has already begun.[9]  And therein lies the

---

American citizens' privacy rights. *Mr. Chow and the public's only hope is transparency in government affairs*" (emphasis added).

[7] *See*, *e.g.*, Defendant's Motion to Dismiss For Selective Prosecution (Docket Nos. 883, 884 at pgs. 1-12)(revealing identities of cooperating sources who wore bodywires and identities of uncharged third parties, in violation of Protective Order); *Id.* at Docket No. 884, pgs. 1-12)(revealing information from wiretaps in violation of wiretap sealing orders and 18 U.S.C. § 2518(8)(b)); *Id.* at pg. 2 (revealing date of birth of third party, in violation of Fed. R.Crim.P. 49.1 ); *see also* United States Response to Court Order, Docket No. 819 at Exhibit 1, Declaration of FBI Special Agent Ethan A. Quinn (describing evidence that draft version of Defendant's Motion to Dismiss for Selective Prosecution appeared to have been provided by CHOW's counsel to San Francisco Examiner prior to being filed).

[8] "New Details on FBI's Lavish Spending In 'Shrimp Boy' Case," San Francisco Chronicle, September 8, 2015(identifying a photograph of a particular individual as an undercover agent, and attributing the identification to attorneys for CHOW).

[9] See, e.g., Interview By Pat Thurston on KGO Radio on September 18, 2015 of CHOW's counsel, in which counsel alleges that agents continued investigation against CHOW because agents

6

fatal flaw with CHOW's entire legal argument: he has offered no evidence whatsoever as to why he now needs the UCEs' true identities, on top of the ample cross-examination material that is already available to him.

## IV.   ARGUMENT

CHOW makes four factual arguments in his motion, but none of these arguments demonstrate why the true identities of the UCEs are critical for cross-examination purposes. The United States responds to each of these four arguments below in turn.

### A.   CHOW Is Entitled To Portray An Unflattering Image of the UCEs, But CHOW Does Not Need the UCEs' True Identities To Do So

CHOW claims that he needs the true identities of the UCEs so that he can portray unflattering images of them on cross-examination. CHOW then identifies and describes in detail the evidence that he intends to introduce in order to paint that unflattering image. This includes, among other things, evidence that, according to CHOW:

- The UCEs "set out to create a RICO that did not exist by initiating money laundering, marijuana, stolen liquor and stolen cigarette schemes."  Def. Mot. pg. 11.

- UCE 4599 wrote 302s that were misleading and omitted exculpatory information.  Def. Mot. pg. 12.

- A critical inculpatory statement allegedly made by CHOW was not recorded by UCE 4599.  Def. Mot. pg. 15.

- UCE 4599 was motivated to skew his reporting of the investigation so that he could continue to meet with defendants at high-end restaurants.  Def. Mot. pg. 16.

- UCE 4599 urged defendants to make payments to CHOW.  Def. Mot. pgs. 12-14.

- UCE 4599 made payments himself to CHOW against CHOW's will.  Det. Mot. pgs. 14-15

- UCE 4599 used language reminiscent of the lead character from the movie *The Big Lebowski*.  Def. Mot. pg. 16.

- UCE 4599 is a racist misogynist who frequents strip clubs and urinates on others for pleasure.  Def. Mot. pgs. 16-17.

---

supposedly had girlfriends in San Francisco and did not want to be posted to Utah instead. Available as of October 4, 2015 at https://itunes.apple.com/us/podcast/pat-thurston/id972749445. It should be noted that such statements may well have violated Rule 5-120 of the California Rules of Professional Conduct regarding trial publicity. The United States leaves that argument for another day and another forum.

7

The United States will of course contest and expose all[10] of these supposed shortcomings of the UCEs as false and misleading; that fight is one of many that will take place at trial in front of the jury. But for the purposes of the instant motion to compel, the ramifications of CHOW's description of the evidence he intends to offer are abundantly clear: CHOW already *has* ample material that he can use to paint his unflattering image of the UCEs and to effectively cross-examine them. To put it more succinctly, by outlining in detail all of the evidence that he will use to cross-examine the UCEs, CHOW defeats his own motion.

Crucially, CHOW demonstrates no need whatsoever as to why he now needs the true identities of the UCEs in order to effectively cross-examine them. He makes only one speculative suggestion, that he believes UCE 4599's "criminally inclined personality was dyed in the wool." Def. Mot. at pg. 18. Counsel for CHOW poses a similar conjecture in his declaration, stating "that based on my experience both legal and non-legal, the likelihood of UCE 4599 containing his credibility shortcomings to his professional life on just the U.S. v. Chow case is minute." Def. Mot. at. Exhibit 1, pg. 2. That is it; CHOW's supposedly dire need for the UCEs' true identities rests entirely on the speculation and life experience of CHOW's counsel. Reading between the lines, then, it seems that CHOW wants UCE 4599's true identity so that he can question people in UCE 4599's community about whether they know that UCE 4599 is in fact an undercover agent, and whether UCE 4599 is in fact a racist misogynist who visits strip clubs and urinates on others for pleasure.[11] This is precisely the type of effort to "harass, annoy, and humiliate" that the Supreme Court has reasoned is "beyond the bonds of proper cross-examination." *Alford v. United States*, 282 U.S. 687, 694 (1931). Certainly the Confrontation Clause does not give CHOW the right to explore such preposterous avenues of cross-examination; as discussed

---

[10] All, with the possible exception of the *The Big Lebowski* comparison. The United States takes some comfort in the fact that The Dude abides.

[11] By no means is the government being alarmist about the likelihood of this scenario actually occurring. In fact, one defendant in this case, Keith JACKSON, has already attempted a similar "investigative" tactic. Specifically, a private investigator for JACKSON went to the home address of an individual he believed to be UCE 4773, knocked on the individual's neighbor's door, and asked the neighbor if she knew whether the individual still worked for the FBI, apparently in an effort to find out whether UCE 4773 had been terminated because of allegations of financial misconduct. Needless to say, such actions could immediately put the safety of undercover agents at risk, not to mention endanger their future usefulness as an undercover.

8

above, the Confrontation Clause "guarantees an opportunity for *effective* cross-examination, *not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.*" *Van Arsdall*, 475 U.S. at 678 (emphasis added).

### B. The United States has Presented Credible Evidence That Revealing the UCEs' Identities Will Place Them In Danger, And Is Not Required To Present Such Evidence To The Defendants

The United States on several previous occasions set forth credible and specific evidence from this investigation explaining why the UCEs could be placed in danger if their true identities were revealed. CHOW dismisses this evidence, characterizing it as "pure applesauce." This Court should be deeply troubled by that characterization. What CHOW calls "applesauce" includes, among other things, the following incidents involving actual violence, threats of violence, and boasts about violence by CHOW and others:

- On March 19, 2011, CHOW described the placing of a figure outside of a restaurant to send a message of intimidation to other groups. Complaint Affidavit of Special Agent Emmanuel Pascua (herein, "Complaint") at pg. 31; Bates US 800002 1D45 at 0:10:19.[12]

- On April 13, 2011, CHOW described that he had nothing to prove as a tough guy anymore, but that if anything happened to him, the person who did it would pay a tremendous price and their life would disappear. Complaint at pg. 31; Bates US 800002 1D 53 at 2:00:00.

- On May 26, 2011, co-defendant George NIEH to UCE 4599 stated that if he thought someone was a rat they would kill them or chop off their tail. Complaint at pg. 31; Bates US 800002 1D 64 at 0:35:30.

- On September 22, 2011, NIEH described CHOW to UCE 4599 as a member of the Triad, an international criminal organization. Complaint at pg. 31; Bates US 800002 1D 82 at 0:05:25.

- On October 19, 2011, CHOW stated to UCE 4599 that the last time someone posed a threat to CHOW, CHOW "dropped him." Complaint at pg. 32; Bates US 800002 1D 89 at 1:45:00

---

[12] In his motion, CHOW urges the Court to pretend that these incidents never occurred and that evidence about them does not exist, because the United States has thus far referred to them by citing only to the complaint affidavit, not to specific items in discovery. That argument is incredulous. The complaint affidavit in this case was, of course, sworn to by an FBI agent under oath before a U.S. magistrate judge. Moreover, CHOW's criticism is entirely unwarranted, given that CHOW has apparently been able to find and transcribe numerous recordings that, according to him, support his motion. On top of that, several months ago the United States provided all of the defendants with detailed indices of recordings that could be searched by date, and more recently with an exhibit list identifying particular excerpts of transcripts that it may play at trial. Unless the Court so desires, the United States will not inundate the Court with dozens of audio files in support of this motion, when simple references to the complaint affidavit will suffice. Nonetheless, for CHOW's benefit the United States identifies each incident described above by Bates number.

9

- On November 17, 2011, CHOW described to UCE 4599 that he had removed his protection from a rival tong member, Jim Tat Kong, and that Kong could now be killed. Complaint at pg. 32; Bates US 800002 1D 2:57:40. Kong and another individual were subsequently murdered.

- On January 25, 2012, CHOW described to UCE 4599 that he was not involved in any criminal activity but that he had some pretty rough people in the city if he needed them. Co-defendant Andy LI described that he had returned to the Bay Area from Los Angeles to handle a problem with CHOW's rival Kong, and that LI was going to "get rid of the bugs." Complaint at pg. 33; Bates US 800002 1D 104 at 3:25:00, 0:16:00 (second session); 0:36:00 (second session)

- On February 16, 2012, CHOW discussed his influence over Tong members from other locations, including New York. Complaint at pg. 33; Bates US 800002 1D 109 at 1:42:00

- On March 16, 2012, co-defendant Kongphaet CHANTHAVONG told UCE 4599 that if UCE 4599 ever needed anything, CHANTHAVONG would have his "guys take care of it." CHANTHAVONG described that he had five guys as a "Black Operations Team" that were loyal to CHANTHAVONG only, and that CHANTHAVONG was loyal to defendant CHOW. CHANTHAVONG described how he got in an altercation the previous week in which he beat a person with a golf club. Complaint at 33-34; Bates US 800002 1D 119 at 3:30:30

- On April 20, 2012, defendant CHOW told UCE 4599 that if he ever got "hit," there would be a lot of people to avenge his death. Complaint at 34; Bates US 800002 1D 125 at 1:42:30

- On September 20, 2012, NIEH described CHOW to UCE 4599 as having a Triad number of "489" signifying the Dragonhead. Complaint at 36; Bates US 800002 1D 162 at 0:06:25.

- On January 10, 2013, PAU discussed Triad membership with UCE 4599 and ranks for different defendants including CHOW and PAU. PAU discussed how CHOW took over the Chee Kung Tong ("CKT") when Allen Leung was murdered. Complaint at pg. 37; Bates US 800002 1D 204 at 0:50:00.

- On February 13, 2013, LI told UCE 4599 that he and co-defendant Al NHINGSAVATH were doing their "homework" on UCE 4599, which UCE 4599 understood to mean that they were investigating UCE 4599's background. LI told UCE 4599 that he had learned that the address on UCE 4599's business card came back to a UPS Store. UCE 4599 explained that was because his company was a front company. LI also said he wanted to verify UCE 4599's Italian heritage. Bates US 800002 1D 214 at 14:00

- On March 29, 2013, CHANTHAVONG told UCE 4599 that LI was the new head of enforcement for the CKT and that CHANTHAVONG was the head of security. LI discussed with UCE 4599 his prior acts of violence. Specifically, LI mentioned how he ran a person over with his car because LI thought the person was challenging LI. LI also discussed how he got into a fight with a group of individuals and that when he fights, he tries to kill the individual. LI also discussed an incident when he became upset with one of his wife's co-workers; LI conducted surveillance on the co-worker's boyfriend, obtained the VIN number to the boyfriend's car, and had a spare key made so that LI could get into the car to threaten the boyfriend (though LI said he did not follow through with this incident). LI also talked about different ways to inflict pain on individuals who crossed him, including injecting them with tranquilizers, gluing their penises shut and then force-feeding them water, and taking electrodes from a stun gun, placing them up someone's nose, and then pulling the trigger. LI further told UCE 4599 that when he is crossed by an individual, he comes up with several ways to retaliate, and that he would take his time to seek retribution. LI said his intent to hurt people would not be swayed by time. LI also discussed with UCE 4599 a third party whom LI loved, but whom LI wouldn't hesitate to "beat the fuck out of." CHANTHAVONG then told UCE 4599 that if UCE 4599 ever needed someone taken care of, that CHANTHAVONG had "niggas that can take you out from 500-1000 yards." Complaint at pg. 38; Bates US 800002 1D 232 at 2:30:40.

10

- On April 17, 2013, CHOW told UCE 4599 that there were a lot of smaller criminal crews in the Bay Area, that CHOW was not the leader of the small crews but when CHOW "calls them out" they all come out to support CHOW. CHOW said "if anyone fucks with me, they are done for." Complaint at pg. 38; Bates US 800002 1D 242 at 1:04:30

- On July 18, 2013, defendant Pau again discussed roles within the CKT with UCE 4599. PAU agreed that LI was a soldier and made the shape of a gun with his hand and described him with the Triad number of "426" – signifying a soldier. PAU said that he would be responsible for making the call on a hit and LI would be responsible for carrying it out. Complaint at 38-39; Bates US 800002 1D 276 at 0:19:00; 0:50:00.[13]

- On August 27, 2013, co-defendant Rinn ROEUN discussed a potential murder for hire with UCE 4599, with defendant Brandon JACKSON present. When ROEUN went to the bathroom, defendant Brandon JACKSON told UCE 4599 "he could do it [the murder for hire], or I could do it too." Complaint at pg. 69; Bates US 800002 1D 298 at 1:27:00

- On August 28, 2013, ROEUN discussed the murder for hire with UCE 4599 again and referred to having a "guy" and needing to know the identity of the victim and the "job will get done." Complaint at pg. 69; Bates US 800002 1D 325 Out_davidjordan 7073636348_08-28-2013_110535PM.wav

- On September 13, 2013, LI described wanting to "smash" people who spread rumors about a fight between CHOW and LI. Complaint at pg. 71; Bates US 800002 1D 312 at 0:23:00

More recently, as discussed in greater detail during the pretrial conference in this matter on September 28, 2015, in the last several days the United States has developed information that CHOW solicited the murders of two individuals, Allan Leung and Jim Tat Kong, whom CHOW perceived as being disloyal to him. Those two individuals were ultimately murdered (along with a third individual who happened to be present with Kong at the time Kong was murdered). UCE 4599 frequently had recorded discussions with CHOW in which CHOW discussed how important loyalty was to him, and in which UCE 4599 and CHOW discussed how UCE 4599 was like part of CHOW's loyal family. *See, e.g.,* Bates US 800002 1D 232 (second session) at 31:00. CHOW now knows that UCE 4599, like Leung and Kong, had no loyalty to him whatsoever. The actual threat to the safety of UCE 4599 could hardly be clearer.

---

[13] CHOW apparently takes issue with this particular incident, claiming in his motion that the recording makes no reference to a "hit," a killing, or an assault. As discussed above, though, during the conversation PAU made the shape of a gun with his hand, making clear to UCE 4599 that he was talking about LI killing someone. If CHOW wants to argue to the jury at trial that PAU was in fact talking about "making the call" to a restaurant to order takeout, for example, and that LI was then going to "carry out" the food order, he will of course be free to do so, but it is a dubious argument at best. In any event, CHOW overlooks a later portion of the same meeting between PAU and UCE 4599, where PAU and UCE 4599 discussed how to kill someone: UCE 4599 said "when you have to, you have to." PAU agreed, but said that you couldn't kill family, or children, unless the family was involved, in which case they were "fair game." The United States will provide the Court with the actual recording of this meeting and a transcript if the Court so desires.

11

CHOW claims that the "most serious allegations" among the incidents he characterizes as "applesauce" concern "defendants - Roeun, Sullivan, and Brandon Jackson – who were never members of the Chee Kung Tong and who have long been in custody." Def. Mot. at pg. 19.  This claim is misleading on multiple levels.  First, while the actions of ROEUN, SULLIVAN and Brandon JACKSON are clearly troubling, they pale in comparison to the conduct described above by LI, CHANTHAVONG and CHOW.  Second, SULLIVAN and JACKSON both pled guilty to conspiring to conduct the racketeering affairs of the Chee Kong Tong.  Most importantly, though, the critical issue at stake here is *whether* there are any threats to the witness's safety.  Who in particular is posing those threats is of no moment whatsoever.  *See*, *e.g.*, *United States v. Celis*, 608 F.3d 818, 832 (D.C. Cir.), *cert. denied*, 562 U.S. 1052 (2010)(noting that "appropriateness of using pseudonyms to protect witnesses does not depend on whether the threat to the witness comes directly from a defendant or from another source.")

CHOW further claims that he is entitled to an evidentiary hearing at which the United States would have to offer evidence supporting its claims of danger.  CHOW says that at this hearing he would offer a rather curious rebuttal argument that CHOW in fact knew that UCE 4599 was an undercover agent, but kept him around anyway as a "form of life insurance, as the government would not allow their agent's well-being to be threatened."  Def. Mot. at pg. 20.  CHOW, however, cites no legal basis whatsoever for his demand for an evidentiary hearing, and with good reason, too: there is none.  To the contrary, numerous courts that have addressed this issue have allowed the government to offer evidence of potential danger to the court *in camera*, not at a contested evidentiary hearing.  *See, e.g.*, *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969); *United States v. Ramos-Cruz*, 667 F.3d 478, 500-01 (4th Cir. 2012).  So while the United States certainly looks forward to hearing CHOW's explanation that he kept committing crimes with UCE 4599 because he in fact sought law enforcement protection, this motion is neither the time nor the place for such evidence to be offered.  Such matters are for the jury to consider at trial.

### C.   This is Not a *Brady* Issue

CHOW next claims that he is entitled to the true identities of UCEs under *Brady*.  This argument is quite clearly erroneous.  The actual names of UCEs are not in and of themselves exculpatory.  Nor are

12

the names themselves *Giglio* information, meaning impeaching information. *Brady* and *Giglio* are the United States' self-executing obligations which it has, and will continue to, scrupulously observe. But demanding that the United States disclose the true identities of UCEs either *Brady* or *Giglio* information is clearly incorrect.

### D. Disclosure of the UCE's True Identities to the Public is Not Inevitable

CHOW claims that the Court should order the disclosure of the UCEs' true identities because "unless the government intends its UCEs to appear at trial like New York Knicks fans, with bags over their heads, using pseudonyms at trial would be unlikely to long shield their identity." Def. Mot. at pg. 25. With all due respect to fans of the New York Knicks, the United States need not take such extreme measures to protect its UCEs. Rather, the United States is confident that, together with the United States Marshals and court security officers, sufficient measures can be taken to ensure the safety of the UCEs while still allowing CHOW the right to confront them at trial.

The one thing that *will* inevitably lead to the UCEs' true identities being publicized is disclosure to CHOW. As discussed above, counsel for CHOW has repeatedly insisted that he has a right to share protected discovery materials with the media and the general public. Most alarmingly, counsel for CHOW apparently identified photographs of one person he believes to be a UCE to reporters for the San Francisco Chronicle. In short, but for CHOW's counsel, there is nothing inevitable about the disclosures of the UCEs' true identities.

## V. CONCLUSION

CHOW's motion should be dismissed as moot. Even if the Court reaches the merits, though, CHOW misunderstands the applicable law regarding confrontation of witnesses. In particular, he offers no explanation why he cannot conduct effective cross-examination of the UCEs without knowing their

//
//
//
//
//

13

true identities. He also mischaracterizes this issue as a *Brady* issue, and incorrectly assumes that disclosure is inevitable. For all of these reasons, his motion should be denied in its entirety.

DATED: October 6, 2015                               Respectfully submitted,

                                                     BRIAN J. STRETCH
                                                     Acting United States Attorney


                                                     */s/ S. Waqar Hasib*
                                                     WILLIAM FRENTZEN
                                                     SUSAN BADGER
                                                     S. WAQAR HASIB
                                                     Assistant United States Attorneys