IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

      Plaintiff,

          v.                  Case No. 14-CR-196-CRB-001

KWOK CHEUNG CHOW,

      Defendant.

_____/

**DEFENDANT CHOW'S MOTION TO DISMISS FOR
OUTRAGEOUS GOVERNMENT CONDUCT AND/OR
PURSUANT TO THE COURT'S SUPERVISORY POWERS
(Evidentiary Hearing Requested)**

J. TONY SERRA, SBN 32639
CURTIS L. BRIGGS, SBN 284190
TYLER SMITH, SBN 289188
506 Broadway
San Francisco, CA 94133
Tel. 415-986-5591
Fax 415-421-1331

Attorneys for Defendant
KWOK CHEUNG CHOW

# Table of Contents

INTRODUCTION................................................. 1

FACTUAL BACKGROUND........................................... 1

ARGUMENT.................................................... 7

I. Defendant Chow's Legal Basis for Dismissal is Rooted in
Established Precedent of Cases Comparable to this One. ....... 7

II. All Six *Black* Factors Support a Finding That The Government
Engaged in Outrageous Conduct. ............................. 12

 *A. The First Two Factors from* Black, "*Known Criminal
 Characteristics of the Defendants" and "Individualized
 Suspicion of the Defendants" Should be Afforded Little Weight
 Because They are a Product of the Government's Fabrication of
 Crimes.*................................................... 12

 *B. The Government's Role in Creating the Crimes Supports
 Dismissal.*............................................... 14

 *C. The Government's Active Encouragement of the Defendants to
 Commit the Offense Conduct Supports Dismissal.*............. 15

 *D.  The Nature of the Government's Participation in the
 Offense Conduct Supports Dismissal.*....................... 17

 *E. The Nature of the Crime Being Pursued and Necessity for
 the Actions taken by the Government in Light of the Nature of
 the Criminal Enterprise at issue Supports Dismissal.*....... 18

III. The Indictment Should Also Be Dismissed Pursuant to the
Court's Supervisory Powers to Protect Judicial Integrity and
Deter Future Government Misconduct. ........................ 20

 *A. Some Instances of Government Misconduct* ............... 21

CONCLUSION................................................. 47

DECLARATION OF COUNSEL...................................... 50

## Cases

*Greene v. United States*, 454 F. 2d 783 (9th Cir. 1971)........... 8, 9, 10, 11

*United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir.1991)........ 20

*United States v. Batres-Santolino*, 521 F.Supp 744 (N.D. Cal. 2012)..... 10, 11

*United States v. Black*, 733 F.3d 294 (9th Cir.2013)..................... passim

*United States v. Bogart*, 783 F.2d 1428 (9th Cir. 1986)...................... 7

*United States v. Hastings*, 461 U.S. 499 (1983)............................. 20

*United States v. Ross*, 372 F.3d 1097 (9th Cir. 2004)....................... 20

*United States v. Smith*, 538 F.2d 1359 (9th Cir. 1976)...................... 10

*United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978)................... 10, 17

*United States v. Williams*, 547 F. 3d 1187 (9th Cir. 2008)................. 14

## Statutes

Hatch Act of 1939......................................................... 22

## INTRODUCTION

History will show that this prosecution was the most shocking of all time.  The FBI attacked democracy, the right to vote, the People's voice, and spat in the eye of the legislature, all in one swift blow leading up to the April 3, 2014, Indictment [Dkt. ECF 113].  They forced the taxpayer to compete against the FBI to support elected officials and they used taxpayer money to do it.  The FBI lied, cheated, and stole. The United States Attorney's office protected political criminals and at the same time sought to credit itself with interfering with crime the Government created.  They knowingly imprisoned and prosecuted an innocent man. The Government has shown a lack of regard for human life, even using it as collateral at times.  This conduct is both extreme and outrageous and it constitutes a denial of Due Process regardless of when the issue is raised. The only way to maintain the integrity of the federal judiciary in the Northern District is to acknowledge the severity of the Government's misconduct and dismiss the indictment against Raymond Chow.

## FACTUAL BACKGROUND

In 2000, Raymond Chow abandoned his life as a gangster when he took the righteous path and defected from gangs.  He took the witness stand against his former gang the Wo Hop To triad.  He did so based on principle, but with assurances from the United States Attorney and the Federal Bureau of Investigation that he would be provided with a new identity and safety.[1]  To obtain

---

[1] *See* <u>Exhibit A</u>, letter from William Schaefer.

1

this new life and identity, Raymond Chow took the stand to testify for the government about one of the largest criminal networks in America.  Assistant United States Attorney William Schaefer wrote, "Chow's cooperation, to date, has been exemplary."[2]  It was not Raymond's wish to do the Government's bidding, but his testimony was a turning point for him because it would give him a dignified starting point to rebuild his life, which was in a state of devastation and poverty.

In exchange for his cooperation, Raymond was assured that his S-Visa would be processed, and that he would be interviewed by witness protection and given a new identity.[3]  Raymond was released from prison in 2002, but to his surprise, he was not given a new identification card and social security number and the legal right to work; he was dropped off in Chinatown without any protection from those who wanted to kill him, to wit: Peter Chong's Jackson Street Boys gang.

Months later, the Government took Raymond into custody and initiated deportation proceedings contrary to what he was promised.  He remained in custody for approximately another eight months when two FBI agents (two of the same agents who work on the present case) gained his release from custody for a reason that is mysteriously absent from any documents available.  They fitted an ankle monitor on him and, to his dismay, drove him back to Chinatown.  He was confined to house arrest at his brother's home and assigned a parole officer and an ICE officer

---

[2] *See* <u>Exhibit A</u>, letter from William Schaefer.

[3] *See* <u>Exhibit A</u>, letter from William Schaefer.

to monitor his every move.  He was confined to a public address right in the middle of Peter Chong's Jackson Street Boys' territory after having recently assisted the Government in gaining a conviction against Chong.  He was a sitting duck.

In 2005, Raymond received multiple death threats.  With Chow's life still in danger, a known drug dealer hungry for power was on a run of his own, having not been held accountable for any crime since 1992.  That person was the notorious Jim Tat Kong.  Kong plotted to have Raymond Chow murdered.  Chow sued the United States government for specific performance of its promise of an S-Visa and to provide him protection by granting him a new identity.  With Chow's motion to compel specific performance moving forward, Brian Stretch admitted that the promise for an S-Visa should be fulfilled.[4]  It never was.

After suffering a nervous breakdown from the pressure and the poverty associated with his plight, Raymond outlined exactly how he would survive: he would strictly avoid engaging in any criminal activity and stay out of trouble with the gangsters that surrounded him.  However, he had no choice but to be on the same sidewalks with them at times.  After all, he was forced to be in Chinatown against his will.

Raymond spent most of his time in Chinatown performing daily services for the community.  He was well-known and well-regarded as a changed man and as a person who cared deeply about his community.  He became a curator of history for Chinese

---

[4] Raymond Chow is one of the few people to attempt to hold the government to its promise by suing for a new identity and a new life. More is discussed below.

heirlooms and antiques, and he began to mentor a younger generation of Chinese Americans so that they felt included in Chinatown, and to help them understand the struggles of their ancestors.

In 2006, as Raymond was building a positive reputation as an honest law abiding citizen, Allen Leung was murdered.[5] Raymond Chow wore a white suit to Mr. Leung's funeral as a sign of traditional Chinese respect.  Unfortunately, the uninformed FBI interpreted Raymond's choice of suit color to be a "rise to power" thereby launching a decade of undercover operations and prosecution against Chow.

Raymond Chow was never a genuine suspect in the killing of Alan Leung.  It was widely reported in Chinese media that a person known to the FBI was present when Leung was murdered and it was also known that the FBI allowed that person to flee to Hong Kong.  That person had business interests which were impacted by Leung's decisions as the leader of the Hop Sing Tong (not the Chee Kung Tong).  Leung's murder remains unsolved by design.

In 2010, Raymond Chow initiated and attended a meeting with Brian Stretch at the United States Attorneys' office for the purpose of finally obtaining his S-Visa so he could lawfully

---

[5] Having a Chinatown public figure murdered was not enough to bring the Government to the realization that they should follow through on their promise to process Raymond Chow's S-Visa. Despite Brian Stretch's comments the previous year, it had still not been done. In 2007, Raymond Chow once again sued the United States government for his S-Visa and his legal right to work. Raymond Chow separated himself from any other criminal figure in his history. He wanted a different life so bad he sued the government twice.

work.  Everyone in that meeting, FBI agents included, sat at the table across from Raymond and lied.  They did not ask him one question about Allen Leung.  Yet, according to the FBI, Raymond was a person of interest.[6]  He was never charged with the murder until Raymond refused to concede to a continuance in the present matter.  Now, he is accused of the murder.

The Chee Kung Tong in San Francisco was reeling from the murder of their Dragonhead, Allen Leung.[7]  Raymond Chow did not want to be Dragonhead, but he assumed the role because he was so honored that his Chinatown elders considered him deserving of the position.  In accepting this position he became a paternal guardian, not over any criminal enterprise, but over the tradition of assisting American-Chinese individuals in acculturating into this community.  Raymond Chow had an important goal to the aging Tong community, and that was to be a strong leader who could lead through respect and not violence. He also made it a priority to open membership to all ethnic groups, to unveil traditional secrets, and to reinforce law-abiding behavior among Tong members.

---

[6]  It can be inferred that the present undercover operation started after Allen Leung's murder; and even though the real killer remains free, it is the murder that justified the funneling of untold taxpayer funds to saturate Chinatown with informants, and agent provocateurs, in an atmosphere so anti-Chinese that it is reminiscent of a bygone era of 1800s San Francisco.

[7]  Leung had never been accused by police of being a criminal. The police and the FBI have said publicly that the Chee Kung Tong was not a criminal organization, and the role of Dragonhead never had its current stigma attached to it until Raymond Chow took it over. In fact, the hypocrisy is evident in the present day because Allen Leung's reputation remains intact according to the FBI. Yet, somehow Raymond Chow's role as Dragonhead of Chee Kung Tong has a criminal element.

Despite all the obstacles he faced, Raymond felt very good about the progress he had made.  He made a new goal for himself: he would write an autobiography about his journey to redemption so that he could provide for himself and stop relying on the charity of others.

Raymond Chow's new life as a penniless community service advocate and writer was not acceptable for the Government.  In 2006, the federal government launched a series of large-scale, deep-cover covert operations on Raymond.  The primary event the government used to justify undercover operations was the murder of Allen Leung and Chow's wearing of a white suit.  The investigation was unique in that not one application was ever made to monitor Raymond Chow's telephone.  In fact, it was between three to ten years (depending on whom one believes) before the FBI would even apply for warrant to intercept any communication in this entire investigation, and even then it was not for Raymond's phone but for the phone of his friend George Nieh.

In all the years investigating Chow, the Government has not alleged one instance where he knowingly and/or financially benefited from criminal activity.  They have identified no means of hiding assets.  They have undoubtedly looked into Chow's girlfriend of over seven years, only to find her to be a hard-working Cal graduate and business owner.

This case entails the Government's undercover informant, UCE 4599, who, after failing to legitimately snag Chow, independently engaged in criminal acts with people who knew Raymond and who were introduced to the undercover agent because

the agent insisted on buying expensive dinners and footing the bill for alcoholic drinks for all who would show up.  The agent's monthly visits with Raymond sometimes attracted nearly a dozen people who were along for the free ride on what turned out to be the taxpayer's tab.

This motion highlights the numerous instances of extreme and outrageous conduct committed by the government throughout its quest to convict Raymond Chow of crimes he never committed. Unlike many prosecutions, the extreme and outrageous conduct did not stop with the indictment, but in some instances were even more egregious.

### ARGUMENT

### I.
### Defendant Chow's Legal Basis for Dismissal is Rooted in Established Precedent of Cases Comparable to this One.

In *United States v. Russell*, the United States Supreme Court discussed the issue of outrageous government conduct and stated:

> [W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.

*United States v. Russell*, 411 U.S. at 423, 431-32 (1973). In *United States v. Bogart*, 783 F.2d 1428 (9th Cir. 1986), the Ninth Circuit reaffirmed that "law enforcement conduct [] becomes constitutionally unacceptable 'where government agents engineer and direct the criminal enterprise from start to

7

finish,' or when governmental conduct constitutes 'in effect, the generation by police of new crimes merely for the sake of pressing criminal charges against the defendant.'" *Id.* at 1436 [internal citation omitted].

Justice Hamley of the Ninth Circuit established the foundation of the 9th Circuit's current outrageous government conduct jurisprudence in finding that the standard required for an outrageous government conduct motion was satisfied in *Greene v. United States*, 454 F. 2d 783 (9th Cir. 1971), a case nearly identical to the case at bar.

In *Greene*, a special investigator posing as a member of a bootleg whiskey syndicate reestablished contact with defendants who had been previously convicted of possessing an unregistered distilling apparatus, sale without stamp of distilled spirits, and conspiracy. The agent offered to supply the defendants with the equipment, ingredients, manpower, and financial assistance necessary to manufacture alcohol. He then urged them to resume production in order to produce alcohol and sell it to him as their sole customer. The defendants were supplied with sugar by the agent, and produced liquor for him for 2.5 years before being arrested. The court found that this conduct was outrageous and required a dismissal because: 1) the agent contacted the defendants to initiate the criminal conduct during a time at which the agent had no reason to contact them, 2) the bootlegging activities were "extended in duration," 3) the involvement of the agent was substantial in nature because he portrayed himself as their partner in the alcohol business, 4) the agent applied pressure to prod the defendants into

8

production of bootleg alcohol by implying that the "syndicate" he worked for was unhappy with their progress in an effort to boost production, 5) the government did not attach itself to an on-going bootlegging operation, but rather created criminal conduct by establishing and supporting a new operation, and 6) because the government was the sole customer of the illegal operations it helped to create. *Id.* at 786-87. The court emphasized that "none of the factors which we have pointed to as significant would necessarily require reversal of a conviction. In our view, it is the combination which is important." *Id.* at 787.

This "combination" standard has been the norm in the years post-*Greene*. Most recently, in *United States v. Black,* 733 F.3d 294 (9th Cir. 2013) the Ninth Circuit identified six factors applied in prior outrageous government conduct cases in its consideration of the totality of the circumstances surrounding the government's alleged outrageous conduct:

1) Known criminal characteristics of the defendants;

2) Individualized suspicion of the defendants;

3) The government's role in creating the crime of conviction;

4) The government's encouragement of the defendants to commit the offense conduct;

5) The nature of the government's participation in the offensive conduct; and

6) The nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue. *Id.* at 303.

Using the standard from *Black* as a guide, this motion will show that the Government's conduct in this case was outrageous, and therefore warrants dismissal of the charges against Raymond Chow.

The two notable cases in which outrageous government conduct motions were successful after *Greene*, *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), and *United States v. Batres-Santolino*, 521 F.Supp 744 (N.D. Cal. 2012) involved situations in which the Government manufactured crimes, despite a lack of criminal activity on the part of the defendants, in order to prosecute those individuals. The United States Court of Appeals for the Third Circuit, in *Twigg* differentiated the facts before it from those in *United States v. Smith*, 538 F.2d 1359 (9th Cir. 1976) where the court did not find outrageous government conduct, emphasized that "the Government did not sow the seeds of criminality and lure the defendant into a conspiracy." *U.S. v. Twigg* (3d Cir. 1978) 588 F.2d 373, 380.

Here, UCE-4599 sowed the seeds of criminality in order to lure defendants into a conspiracy because they lacked any evidence that the CKT Criminal Enterprise existed prior to UCE 4599 creating it with George Nieh was in any way unlawful. The Government's own evidence clearly demonstrates that Chow was trying to protect his Tong from the Enterprise created by UCE 4599. Not one defendant was charged with a crime occurring prior to or independently from this investigation.[8]

---

[8] Chow has recently been charged with solicitation and aiding and abetting in the killings of Alan Leung and Jim Tat Kong. The charges were put before the grand jury in the final hour based on the proffers of several witnesses that even the government admits are unreliable and who now the government

10

In *Batres–Santolino*, Judge Patel of the United States District Court for the Northern District of California, found the Government's conduct to be outrageous when a Government informant, in spite of the defendant's lack of involvement in a drug enterprise, enticed the defendant to come to Ecuador for a drug transaction by claiming that he had access to a major source of cocaine, and that they could utilize their cocaine profits to invest in lucrative legal investments in grain. Judge Patel gave great weight to the fifth factor listed in *Greene* when she emphasized that "this is a case in which the government supplied all the drugs *and* defendants were not involved in a drug-related enterprise until the government agent came on the scene." *Batres–Santolino*, 521 F. Supp at 752 [emphasis in original]. Judge Patel continued: "Although the defendants in this case are not without some culpability, they were not embarked or about to embark on any criminal activity until the government's agents set in motion the operation." *Id*.

The facts in the case at bar, especially with regard to Raymond Chow, are similar to those in *Batres–Santolino* in that Government agents here also manufactured the crimes from start to finish. As in *Batres–Santolino*, the individual defendants here were supplied by the Government with all the money in the money laundering operation, with all of the alcohol in what would become an illegal alcohol operation, and with all the cigarettes in the cigarette operation. The idea to launder the

---

says may not testify. These proffers were accepted only after Chow secured a severance from all other co-defendants. These proffers are unreliable and the government admits this fact.

11

money, to sell the stolen liquor to Chow's associates, and to sell the contraband cigarettes all originated with UCE 4599. Moreover, the government created the network of criminality, which serves as the foundation for the RICO charges. Defendants were not involved in any of these crimes until the Government agents arrived and created them. As with the defendants in *Batres-Santolino*, Raymond Chow had "not embarked [on] [n]or [was he] about to embark on any criminal activity until the government's agents set in motion the operation." *Id.*

## II.

### All Six *Black* Factors Support a Finding That The Government Engaged in Outrageous Conduct.

*A.    The First Two Factors from* Black*, "Known Criminal Characteristics of the Defendants" and "Individualized Suspicion of the Defendants" Should be Afforded Little Weight Because They are a Product of the Government's Fabrication of Crimes.*

The *Black* court noted that "[w]hether the government had reason to suspect an individual or identifiable group before initiating a sting operation is an important consideration." *Black,* 733 F.3d at 304. Although the Government will argue that Raymond Chow had known criminal characteristics due to his prior criminal history, since his release from prison in 2002, he atoned for his past wrongs and become a thoughtful and compassionate person and avoided those associated with his

12

criminal past. Despite Chow's lack of criminal proclivity, the government chose to conduct a multi-year sting operation.[9]

In *Black,* the court warned:

> The risk inherent in targeting such a generalized population is that the government could create a criminal enterprise that would not have come into being but for the temptation of a big payday, a work of fiction spun out by government agents to persons vulnerable to such a ploy who would not otherwise have thought of doing such a robbery.

*Black*, 733 F.3d at 303. The FBI's Domain Management program and the government's conduct in this case are exactly the sort of danger the court warned against. Domain Management permitted the FBI to target a "bad" part of San Francisco, because "[w]ithin this community there has been organized crime for generations."[10] Once UCE 4599 befriended Raymond Chow, he could not sway Chow into pursuing crime with the UCE, so the UCE created a criminal enterprise around him and likely used the Domain Management program as a blank check to fund an otherwise unsuccessful operation. UCE 4599 bragged about the $3.5 - $5 million he had

---

[9] This perceived vendetta is evidenced by the numerous perjurious statements in the various affidavits filed throughout the investigation, as well as other indications of bias, including allowing political allies of Melina Haag off without prosecution despite equal evidence documented by the FBI. The government's misleading and aggressive media campaign subsequent and prior to the issuance of the discovery protective order in this case also supports this view.

[10] Electronic communication from Fed. Bureau of Investigation, San Francisco, Oakland Resident Agency, to San Francisco (June 8, 2009) (on file with author), *available at* http://www.aclu.org/files/fbimappingfoia/20111019/ACLURM011495.pdf (Domain Management – Criminal; Asian-Eurasian Criminal Enterprise).

to invest ("the temptation of a big payday"), and spun out a work of fiction "to persons vulnerable to such a ploy who would not otherwise have thought of" laundering money or committing any of the crimes that UCE 4599 created.

B.  *The Government's Role in Creating the Crimes Supports Dismissal.*

In *Black*, the Court noted that a relevant factor "is whether the Government approached the defendant initially or the defendant approached a Government agent, and whether the Government proposed the criminal enterprise or merely attached itself to one that was already established and ongoing." *United States v. Black*, 733 F.3d at 305. The Court cited *United States v. Williams*, 547 F. 3d 1187 (9th Cir. 2008) as an example of a case where a defendant claimed that the Government created the alleged crime. In *Williams*, the defendant was charged with conspiracy to interfere with interstate commerce by robbery, conspiracy to possess cocaine with the intent to distribute, and possession of a firearm during a drug crime and crime of violence after being caught in a stash house robbery sting. The *Williams* court acknowledged that the standard required for a court to find outrageous government conduct is, "met when the government engineers and directs a criminal enterprise from start to finish." *United States v. Williams*, 547 F.3d at 1199. The court found that the standard was not violated because the defendant had been involved in "a continuing series of *similar crimes*" prior to being caught in the sting operation. *Id.* at 1200 [emphasis added].

14

In Chow's case, he conducted no crimes throughout this investigation. Every alleged incriminating statement attributed to him by the Government has turned out to be untrue and defense counsel is willing to submit actual recordings and transcripts to demonstrate this. UCE 4599 is constantly recorded instigating codefendants by encouraging them to follow through on his criminal ideas—not Chow's.

For example, the Government claims that proof in support of the Enterprise lies in Andy Li's statements to the undercover that he moved to the Bay Area to "take care of the bugs." The Government's version presented these facts in a way to convey that Andy Li was an enforcer for the CKT.  An actual review of the audio conversation and discovery shows Andy Li as an emotionally imbalanced person who, after becoming intoxicated, is told by the UCE that Chow would never ask Li to kill Jimmy Tat Kong and that Li had an obligation to his Dai Lo [big brother] to carry out violence on Kong without instruction from Chow, but on Chow's behalf.

The crimes in the present case were a Government created fiction as well; neither Raymond Chow nor his co-defendants were involved in a continuing series of similar crimes (as those they are charged with) prior to UCE 4599 creating those crimes.

*C.   The Government's Active Encouragement of the Defendants to Commit the Offense Conduct Supports Dismissal.*

The fourth *Black* factor, "[t]he government's encouragement of the defendants to commit the offense conduct" is satisfied here. UCE 4599 manipulated Raymond Chow's co-defendants by

promising more money, providing positive reinforcement to George Nieh[11] and others when they successfully completed the transactions, and showing dismay and frustration when the transaction did not go as planned.[12] UCE 4599 was extremely insistent that Raymond Chow keep whatever money he gave him, despite Raymond's repeated protests, which were made to look insincere in the Government's descriptions of the transactions.[13]

UCE 4599's encouragement of the other co-defendants facing money laundering charges came in the form of cash payments, a percentage of the amount of money laundered. Verbal

---

[11] See, e.g., US 608795 ("The UCE told NIEH he would always take care of NIEH because he has been great business partner to the UCE.")

[12] For example, UCE 4599 expressed his frustration and anger with Jane Liang's negotiations with the liquor deal. *See* US 608475. Other instances of encouragement include UCE 4599 telling Kevin Siu that if he helped him launder a million dollars in one year, he (Kevin) would earn $100,000.00 on it, and UCE 4599 requesting George Nieh bring in others to help with the laundering operation.

[13] For example, the affidavits frequently state that Raymond Chow immediately took the envelope of cash but said "no, no, no" while doing so. In actuality, Raymond Chow genuinely tried to prevent UCE 4599 from giving him the money: See, e.g., 1D066 (on the first of two recordings) at 15:38. Raymond says "No, no, no brother." You can tell by his voice that he really is genuinely pleading with UCE 4599. UCE 4599 says sternly: "You're not gonna argue with me." A few seconds later it sounds like Raymond tried to give the envelope back. UCE 4599 says "No, no, no, no. Things are good. Things are good with George and I. Seriously. Things are good with George and I. Don't say a word. Don't say a word. I love you so much. I love you so much, man." A few moments later it sounds like Raymond tries *again* to give the money back because UCE 4599 again says "No, no, no, no, no. Stop. Stop. Stop. Thanks, brother." UCE 4599 is insistent and aggressive throughout the entire interaction. *See also* 1D072 (on first of two recordings) at 2:57:32 – UCE 4599: "Hey, you dropped this over here." Raymond: "No, no, no, no-" UCE 4599: "No, no, no- you dropped this, man!" Raymond: "No, no, no brother, I'm, I'm good." UCE 4599: "No, no, no, no, brother. Come on." Raymond: "No, no, no, I'm, I'm good." UCE 4599: "Come on. Stop! Things are good, man. I—I love you and respect you, man. Thank you."

encouragement was communicated to George Nieh on several

occasions where UCE 4599 told George he was doing a great job.[14]

   D.   *The Nature of the Government's Participation in the Offense Conduct Supports Dismissal.*

    In *United States v. Twigg*, 588 F. 2d 373, an informant, at

the government's direction, contacted the defendant with whom he

had previously manufactured methamphetamine hydrochloride, and

suggested they start a laboratory to manufacture the drug. The

Government provided the site, equipment, and the chemicals

necessary for production. The informant was in complete charge

of the production process. The defendant's assistance with

manufacturing was minimal, and was at the specific direction of

the informant. The court ultimately found this to be a

significant factor in finding that the government engaged in

outrageous conduct. In *Black*, the court placed particular

emphasis on the duration of the government's participation in

the criminal enterprise stating that, "participation of longer

duration being of greater concern than intermittent or short-

term government involvement" *United States v. Black*, 733 F.3d at

308. The *Black* court took note of whether the Government acted

as a partner in the criminal activity or more as an observer of

the defendant's conduct.

    The Government's investigation into Raymond Chow lasted

between 8 and 14 years. After fabricating the crimes and

---

[14] For example, on July 19, 2012, "[t]he UCE told NIEH he would always take care of NIEH because he has been a great business partner to the UCE." US-608795. On December 6, 2012, "[t]he UCE told NIEH he thought [Tina] LIANG had problems transporting money and that the UCE could help." US 608974.

encouraging the defendants to participate in the crimes, the government agents then actively participated in it. The government provided the money for the money laundering, the cigarettes and shipping for the cigarette deal, and the liquor for the liquor deal. David Jordan was the engine driving each of these transactions forward from start to finish, cajoling each of the co-defendants throughout, and in some cases reminding codefendants that they met the UCE through Chow.

UCE 4599 not only actively facilitated each crime he fabricated, but he also played an indispensable role in effectuating each of them.

> *E.   The Nature of the Crime Being Pursued and Necessity for the Actions taken by the Government in Light of the Nature of the Criminal Enterprise at issue Supports Dismissal.*

In *Black*, the sixth factor the court weighed was the nature of the crime being pursued against the necessity for the actions taken in light of the nature of the criminal enterprise at issue. This last *Black* factor focuses on the justification for the particular law enforcement strategy employed and "consider[s] the need for the investigative technique that was used in light of the challenges of investigating and prosecuting the type of crime being investigated." *Black*, 733 F.3d at 309.

The "criminal enterprise" alleged here, labeled the Chee Kung Tong Criminal Enterprise by the FBI investigators, was based on the 2009 domain assessment of Chinese communities, stating that "San Francisco domain is home to one of the oldest Chinatowns in North America and one of the largest ethnic

Chinese populations outside mainland China," and "[w]ithin this community there has been organized crime for generations."[15] In the government's Affidavit of Special Agent Emmanuel V. Pascua in Support of Complaint, at page 3, footnote 1, the Government agent alleges law enforcement's interest in the Chee Kung Tong began in 2006 when then-Dragonhead of the tong, Allen Leung, was murdered in San Francisco. The agent alleges Chinese tongs "engaged in criminal activities: protecting rackets, extortion, and strong arm methods for controlling such tolerated vices as gambling and prostitution." Nowhere does the Government indicate that it is interested in pursuing suspected money laundering, or sales of stolen or counterfeit cigarettes or liquor. In fact, there are no allegations of protection rackets, extortion, or strong-armed methods for controlling vices anywhere in the current indictment. The crimes in this indictment were entirely fabricated by the Government agents in order to try to ensnare Raymond Chow.

The crimes Chow is charged with did not exist until the Government manufactured them. The Government's actions directed toward the defendants were thus entirely unjustified since those actions were borne out by Government misconduct.

///

---

[15] Electronic communication from Fed. Bureau of Investigation, San Francisco, Oakland Resident Agency, to San Francisco (June 8, 2009) (on file with author), *available at* http://www.aclu.org/files/fbimappingfoia/20111019/ACLURM011495.pdf (Domain Management – Criminal; Asian-Eurasian Criminal Enterprise).

**III.**
**The Indictment Should Also Be Dismissed**
**Pursuant to the Court's Supervisory**
**Powers to Protect Judicial Integrity and**
**Deter Future Government Misconduct.**

The Ninth circuit held in *United States v. Barrera-Moreno* that a district court may dismiss an indictment either to remedy outrageous government conduct amounting to a due process violation, or under the court's supervisory powers to remedy a constitutional violation, to protect judicial integrity, or to deter future illegal conduct. 951 F.2d 1089, 1091 (9th Cir. 1991); see also *United States v. Hastings*, 461 U.S. 499, 505 (1983). Thus, a court exercises its supervisory authority to prevent the government from reaping the benefits of their misconduct, even where the misconduct falls short of a due process violation. As emphasized by the Ninth Circuit in *United States v. Ross*: "Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence." *United States v. Ross*, 372 F.3d 1097 (9th Cir. 2004).

///

///

A.   *Some Instances of Government Misconduct*

*i.The United States Attorney's Office Did Not
Prosecute Certain Political Figures Due To Their
Political Proximity to Melinda Haag.*

The evidence produced by the government clearly shows that
Mayor Lee took $500 from UCE-4773, and laundered it as a
campaign contribution.  Mayor Lee then accepted a follow-up
payment of $19,500 in exchange for political favors, spoke to
UCE 4773 by phone, met with him in person, and assigned a person
to follow through on finding real estate investments where 4773
would be given preferential treatment; yet, Mayor Lee was
effectively given immunity by the U.S. Attorney's Office.  This
reeks of political favoritism, while Raymond Chow sits in jail
awaiting a 'fair trial' the Government makes no efforts to wash
out the stain of bias from the inception of this investigation.

*ii.   The FBI tampered with the San Francisco 2012
election and the U.S. Attorney condoned this
conduct.*

Through their handling of this undercover criminal
investigation, the FBI silently declared War on the legacy of
America.  While America's patriots lost their lives on foreign
soil attempting to bring just a shred of our values to
Afghanistan, Iraq, and the rest of the world, FBI undercover
agents in a state of near total physical safety, in the most
progressive city in the nation, engaged in completely

unnecessary acts which stained, if not set in motion the eventual destruction of the free election process, the separation of powers doctrine, and the right to free speech.

The FBI channeled vast sums of taxpayer money into the mayoral elections in San Francisco, in violation of the Hatch Act of 1939.  The agents victimized taxpaying voters by forcing the voters to compete with the FBI, who was using tax money paid to the Government by those voters, in support of political candidates Leland Yee and Ed Lee. These actions are an attack on democracy, veiled as an investigation, and resulted in the non-indictment of political figures that were and are politically aligned with Melinda Haag, United States Attorney for the Northern District of California.

Any actions by the defense, which had the byproduct of lawfully disclosing such information, were met with false allegations of criminal conduct by the government.[16]

> ### iii. The US Attorney's Office Abused the Media and the Public by False Press Releases Prejudicing Defendants and Failing to Make Corrective Statements.

The US Attorney's Office also launched an aggressive media campaign intent on smearing Raymond Chow's name to the public with false assertions of his guilt, tainting the potential jury pool, and creating an extremely hostile public perception of

---

[16] *See* generally Dkts. 891, 1053, and 1100.

22

Raymond Chow.[17] Even though Raymond Chow has not committed any of the crimes he is charged with, the vast majority of Bay Area residents have deemed him guilty of all charges and then some, thanks to the US Attorney's aggressive media campaign. The Government's actions in this regard irreparably damaged Raymond Chow's right to be presumed innocent until proven guilty. The US Attorney's Office has used its considerable power to influence the public.[18] This conduct should be given great weight by this Court in evaluating the extreme and outrageous government conduct outlined herein. These actions surely shock the conscience of notions of equity, and fair play and justice.

>    **iv.   UCE 4599 forced Raymond Chow to accept Money
>    When Raymond Chow was Inebriated and When UCE 4599
>    Knew Raymond Chow was Inebriated.**

Many of the FBI agents' statements in their affidavits are contradicted by the audio recordings underlying those statements which reveal entirely different scenarios from those described in the affidavits: "UCE 4599 paid Chow $2,000 for allowing him

---

[17] Some initial press releases are attached. It is worth noting that press releases surrounding the racketeering indictment are no longer available for an unknown reason.

[18] An additional incident happened during a hearing to exclude reference of murder from Chow's trial. The USA boldly asserted they had witnesses and evidence of Chow's involvement in murder. They were asked for a public written proffer. Media headlines erupted immediately linking Chow to the murders. When the public proffer came it sounded legitimate. However, an under seal proffer was made which exonerated Chow. This never made the headlines and Chow now faces the prejudice of being associated with the murders due to the USA's conduct.

to work with Chow's people. Chow stated 'no, no, no' but took

the envelope of cash and placed it in his sports jacket pocket."

(Complaint Affidavit at 43, 17 – 18) A review of the body wire

recording reveals an entirely different picture. At 2:57:12 mark

on 1D079:

> **Raymond:**       "Oh, I'm drunk already."
> **David Jordan:**  "Ah, you're alright."
> **Raymond:**       "No, those wine really, really good."
> **David Jordan:**  "Yeah, but we didn't drink that much though.
> **Raymond:**       "When you drink with a [inaudible] it's
> different."
> **David Jordan:**  "Yeah, you're right. That's why I said you
> couldn't have any whisky, that's what I told you, remember?
> You said, I knew the whisky would get you fucked up."
> **Raymond:**       "Well I'm already fucked up, I guess."

Then, at the 2:59:10 mark on 1D079:

> **Raymond:**       "Oh man, I drunk already."
> **David Jordan:**  "Really?"
> **Raymond:**       "Ya, I'm drunk! No, no, no, no. Dave, noo.
> No, I'm, I'm good. I'm good, my book coming out pretty
> soon."

Raymond did not say: "No, no, no" then take the envelope and

place it in his sport coat, as the initial Affidavit represents.

However, the recording clearly reveals that UCE 4599 took

advantage of Ray's drunken state in order to implicate him.

Another instance where UCE 4599 targets and takes advantage

of Raymond, when he is clearly inebriated and his defenses

impaired, occurred on September 22, 2011. It was described in
the following manner:

> UCE 4599 paid Chow $2,000 for allowing him to work
> with NIEH and CHIU. UCE 4599 provided CHOW with an
> envelope that contained $2,000. Chow placed the cash
> on the inside pocket of his sports coat and thanked
> UCE 4599. (Complaint Affidavit at p. 43, line 27
> through p. 44, line 2)

The January 2012 Wiretap Affidavit described it as such:

> Just prior to entering the Target Vehicle UCE 4599
> provided CHOW with an envelope that contained $2000.
> CHOW placed the cash on the inside pocket of his
> sports coat and thanked UCE 4599. (January 2012
> Wiretap Affidavit at paragraph 186, page 46, line 19 –
> 23)

The recording from the body wire, audio file 1D082 (second of
two recordings) at 1:15:01 again paint a different picture:

> **Raymond:** "No, no, no, no, no."
> **UCE 4599:** (interrupting) "Hey no, c'mon. For you. I love
> you man. You're my brother man. I love you so much.
> Thanks."
> **Raymond:** "No, I. . . I. . ."
> **UCE 4599:** "C'mon. C'mon. We're so good together man. We're
> so good. We're so good. We're so good. Thank you. You ready
> George?"
> **George:** "Yeah, let's go."
> **UCE 4599:** "Yeah. Man the fog, it was so nice today! You
> know?"
> **Raymond:** "I'm hella drunk."
> **UCE 4599:** (making a dismissive sound) "Ehh."
> **UCE 4599:** "Hold on Dai Lo."
> **Raymond:** [Something to George in Cantonese]
> **UCE 4599:** "Yeah. Too close. No, no, no, no, Dai Lo. Dai-
> no, no, no. Stop. Stop." [Chow attempts to give the
> envelope back forcibly]

Ray sighs in defeat here after he has just unsuccessfully tried again to give the envelope back to UCE 4599. Raymond's voice and slurred speech reveals that he is feeling the effects of the alcohol. Going drink for drink with the UCE was difficult.

The first time that UCE 4599 gave Raymond Chow money was on March 18, 2011. Earlier that evening UCE 4599 told George Nieh that he wanted to give Raymond the money on another occasion because he could tell that Raymond was drunk. [19]When UCE 4599 had a moment alone with Raymond, he gave Raymond the money while Raymond was drunk.

### v. FBI Agents Lied Under Penalty of Perjury to Judges in Wiretap Applications.

The number of misrepresentations/lies in the various affidavits is astounding. Not only are there numerous misstatements, but many of them are critical statements about culpability, and are blatantly contradicted by the audio evidence. The most devastating lies were told in the Pascua Affidavit because they painted Chow to be someone who presided over a criminal enterprise, who was a crime boss, and who promoted violence, and this was the devastating message that reached the public through the media. None of this was actually

---

[19] See 1D049 (second of two recordings) at 2:21:00.

reflected in the evidence. *See* <u>Exhibit B</u> for a *non-exhaustive* list of statements, which contradict the Government's narrative.

> ### vi. The Government Misled the Public, Then Sought a Gag Order foreclosing Chow's ability to correct the public record.

Once the arrests were made in this case, which were predicated upon the misleading Affidavit of Special Agent Emmanuel V. Pascua in Support of the Complaint,[20] the Government initiated an aggressive and misleading media campaign touting its capture of Raymond Chow and insinuating that they had evidence against him: "[F]ederal prosecutors said a five-year undercover investigation showed that Chow was running a criminal organization that trafficked in drugs, weapons and stolen goods and laundered more than $2 million."[21]  In fact, there is no evidence that Raymond Chow ran the alleged criminal organization, the "CKTCE", or that he was ever involved in the crimes he is charged with. Once the Government had infected the potential jury pool with these lies, it then sought (and

---

[20] The Affidavit in Support of Complaint was filled with misrepresentations about Raymond Chow's participation in the crimes with which he is charged, and this Affidavit is the culmination of a series of Wiretap Affidavits, which contain similar and often the original misrepresentations.  The Complaint Affidavit is the proverbial fruit of the poisonous tree (the original misrepresentations in earlier affidavits).

[21] *Racketeering Charges Filed Against Leland Yee, Raymond 'Shrimp Boy' Chow*, SFGate, August 6, 2014, *available at* http://www.sfgate.com/crime/article/Racketeering-charges-filed-against-Leland-Yee-5647390.php

received) a gag order[22] that would effectively prevent defendants from countering the Government's public statements.

> ### vii. The FBI's Investigation focused on a Civic Organization not a criminal enterprise.

The Chee Kung Tong is a historic Chinese American community organization that was originally a refuge for many Chinese Americans from anti-Chinese sentiment. Also known as the Chinese Freemasons, the Tong, under Raymond Chow's leadership, began accepting individuals of all races and ethnicities as members, because Raymond Chow wanted the tong to be an organization of inclusion and acceptance.

The FBI knew the Chee Kung Tong was not a criminal enterprise. Nelson Lowe, the now-retired senior FBI agent and expert in Asian organized crime, stated: "With any organization, you have a certain percentage of people who may go sideways on you and become organized into criminal activity.... Although they are associated with a tong, they are not representative of what a tong stands for." [23] Nevertheless, the FBI targeted the Chee Kung Tong as a criminal enterprise because, according to

---

[22] The Court granted a protective order but it is clear from numerous statements by the prosecution that they intended to limit speech derived from the content of protected material.

[23] *A Killing in Chinatown*, SFGate, April 8, 2006, *available at* http://www.sfgate.com/news/article/A-KILLING-IN-CHINATOWN-Allen-Leung-a-power-in-2500019.php.

the government, "[w]ithin [San Francisco's Chinese] community there has been organized crime for generations."[24]

The FBI, instead of taking advantage of their vast resources to educate themselves about the culture they infiltrated, blundered in their interpretation of events by attributing sinister motives to an act of respect, such as wearing white to a funeral.  The Government refers to Chow's wearing of a white suit as marking Chow's "rise to power."[2526] This is one of the most significant misinterpretations in the history of American law enforcement and is only one example of outrageous mistakes made in this investigation.

> ### viii. The Government Spent Over $2 Million on This Investigation Aimed at Convicting a Reformed, Innocent Man.

Two million dollars is only the money the government put into play for money laundering. It does not include agent salaries, equipment, etc. The Government spared no taxpayer expense in its vindictive quest to bring down Raymond Chow, despite Raymond Chow's prior cooperation with the government and

---

[24] Electronic communication from Fed. Bureau of Investigation, San Francisco, Oakland Resident Agency, to San Francisco (June 8, 2009) (on file with author), *available at* http://www.aclu.org/files/fbimappingfoia/20111019/ACLURM011495.pdf (Domain Management – Criminal; Asian-Eurasian Criminal Enterprise).

[26] Dkt. 1026, Page 5, Line 16.

his repeated efforts to stay away from the crimes being created by UCE 4599. Undercover agents took Raymond Chow on a fishing trip to Hawaii in an effort to "discuss illegal business activities with CHOW." [27]UCE 4599 tipped valets with $100 bills, he gave a young Chee Kung Tong member a $100 bill for making sure he, Alicia Lo, and another UCE got safely to their car. It was entirely unnecessary.  UCE 4599 bought Alicia Lo $250 shots of whiskey at the city's finest bars. Throughout the entire investigation, UCE 4599 wined and dined Raymond Chow, George Nieh and others, always taking them out to expensive dinners and clubs every time they met. This money was spent so that UCE 4599 could get closer to Raymond Chow, with the ultimate goal to bring him down. Yet, they never were able to engage Raymond in even one conversation in contemplation of a crime. The tax payers paid for the UCE's fake bombshell girlfriend, plain flights, liquor bills, transportation, his $20,000 Rolex watch, his fine wardrobe, they even rented him a luxury apartment in San Francisco at a time when the investigation would not justify such had the facts been accurately reported by agents to FBI management. Trips to Las Vegas, boating outings in Maui and Florida were all expense paid excursions for undercover agents.

---

[27] US 608059.

### ix.  UCE 4599 Tried to Improperly Influence Other Undercover Agents to Perpetuate this Operation.

On March 18, 2011, UCE-4599 told another UCE with the alias "Lisa" that he was going to bring Kevin Siu and George Nieh down to Florida. Lisa said, "I don't know how you do it." UCE-4599 replied, "I don't know either, to tell you the truth. Put in a good word for me. Tell 'em I'm doing alright work." UCE 4599 knew that this investigation could help his career, as long as his superiors knew what a good job he was doing—even if the reality was that at best his efforts equated failure. (*See* 1D049 on the second of 2 recordings at 57:46).

On August 16, 2012, UCE 4599 lied to another UCE over the phone about representations Raymond Chow had made to him regarding a potential source of narcotics in Mexico. At 1:56:30, on 1D151, Raymond told UCE 4599 about an individual named Al who knows people in Mexico, those people ran the port of Mexico. Raymond said he doesn't want to get involved in any business at the port. Chow asked the UCE if he wanted to meet Al who knows everyone at the port. UCE 4599 later called another agent (at 2:31:25 on 1D151), and said:

> "Really quick, next month, introduction to a Mexican source. Mexican, S.O.S. [narcotics supplier]. Yeah, huge. Huge. Yeah. Yep. Yep. Oh, dude. Well it came up because it's like, you know, it came up because it's... he saw the envelope, you know what I'm saying? Yeah. Yep. Bro, you know what I'm saying? Yep. Ain't

31

no lie dude, it's like, I didn't bring it up, you know
he brought it up, you know. So. SB [Shrimp Boy]. Yeah,
yeah, yep, yep. I wanna introduce you to this guy. He
said he runs the ports down in Mexico. Yep, mhm, yep,
yep. Hey. Alright! Okay! That'll keep us going, yeah?
Haha."

Nothing was ever discussed between Chow and the UCE (or anyone

else for that matter) involving a meeting the following month,

narcotics, or an introduction to anyone who ran the port.

Why UCE 4599 lied to agent 4773 that evening is unknown.


### X.  Agents Calculated Payments to Chow to Be
### So Large Chow's Free Will Would Be Overcome.

After years of payments to Raymond Chow the agents decided

to up the ante to see if they could break his commitment to non-

criminal conduct. Agents gave Chow $7,000 and when it did not

work, agent 4599 fabricated the conversation as stated here:

UCE 4599 later called another agent (at 2:31:25 on 1D151),
and said:

"Really quick, next month, introduction to a Mexican
source. Mexican, S.O.S. [narcotics supplier]. Yeah,
huge. Huge. Yeah. Yep. Yep. Oh, dude. **Well it came up
because it's like, you know, it came up because
it's... he saw the envelope, you know what I'm saying?
Yeah. Yep. Bro, you know what I'm saying? Yep. Ain't
no lie dude, it's like, I didn't bring it up, you know
he brought it up, you know. So. SB [Shrimp Boy]. Yeah,
yeah, yep, yep. I wanna introduce you to this guy.** He
said he runs the ports down in Mexico. Yep, mhm, yep,
yep. Hey. Alright! Okay! That'll keep us going, yeah?
Haha." [emphasis added]

32

### xi.  UCE 4599 Offered to Murder Jim Tat Kong for Raymond Chow.

In January of 2012, Raymond Chow spoke with UCE 4599 about his frustrations with Jim Tat Kong, who was affiliated with the Hop Sing Tong. On January 25, 2012, UCE-4599 offered to kill Kong for Raymond Chow.  "While talking about KONG the UCE reminded CHOW about prior conversation when CHOW told the UCE his Dai Lo never had to ask CHOW to do anything because he knew CHOW would always take care of the problem. The UCE commented that something could happen to KONG over the course of the next 10-15 years." (US 608455) Raymond Chow was taken aback by UCE 4599's offer, and said nothing in response. This was not the end of the UCE's obsession with Kong.

### xii. UCE 4599 Solicited Andy Li to Murder Jim Tat Kong and Charged Raymond Chow for the Solicitation.

Chow discouraged Andy Li and UCE 4599 from attempting to harm Kong, yet they charged Chow with solicitation of his murder. Despite filings[28] from the USA consisting of hyperbole about UCE 4599 trying to keep Kong safe[29] and 4599 gauging the

---

[28] Dkt. 1059.

[29] The government has made false statements about curbing violence before "The undercover agents had this conversation with defendant Li out of concern and fear that Li might actually commit some act of violence before he could be

threat level to Kong by asking questions, the truth is

frightening. According to the Government's own transcript in

Dkt. 1059, page 10, lines 16-21, UCE 4599 unsuccessfully

attempted to get Chow to agree to hurt Kong:

> **UCE-4599:**      Why d- why doesn't somebody take care of
> this guy?
> **RAYMOND CHOW:**  Think about the people like that, who-who-w-
> who aren't around him?
> **UCE-4599:**      I tell-
> **GEORGE NIEH:**   He got nobody around him. That's-that's what
> I'm saying.
> **UCE-4599:**      I got to tell you something. It's painfully
> obvious to me, and maybe I'm wrong and maybe it, but
> somebody's going to take care of that cat. Somebody's going
> to take care of that cat. And I'm not saying anything at
> this table,
> **RAYMOND CHOW:**  You know what?
> **UCE-4599:**      but somebody's going to take care of that
> guy
> **RAYMOND CHOW:**  <u>I do not need you to take care of this.</u>
> **UCE-4599:**      No, you don't need to. You don't need to.
> Yep, you don't need to.

According to the same Government filing at page 16, lines

20-22, when first meeting Andy Li, UCE 4599 actually tells Li

that Kong needs to be killed on behalf of Chow and that Chow

will never ask but it needs to be done:

> **UCE-4599:** Whatever happens to him? It's karma. He's got it
> comin' to him.
> **Andy Li:**  Yeah. That was the thing [INDISCERNIBLE
> 00:18:41]--

---

arrested. The conversation was intended as an effort to steer him not to
commit any further acts of violence."Dkt. 462, Page 7, Lines 21-25.

34

**UCE-4599:** So… Nobody— the Dai Lo is never gonna ask anybody to do anything—
**Andy Li:** I know that.
**UCE-4599:** You just gotta fuckin' do it, you know? [Indiscernible 00:18:50].

Later when Chow joins Li and 4599, Li mentions his new plan to "take care of the bugs" to Chow and Chow declines and discourages Li:

**UCE-4599:** No, it isn't, no. Until I like you, I don't like you, bro. 'Cause I trust from my heart, you know?
**Raymond Chow:** [OV][SC]Stay out of trouble
**ANDY LI:** [OV]People like you is harder to find.
**UCE-4599:** Well people like you guys are hard to find.
**ANDY LI:** That's why people like us can connect better.
**UCE-4599:** Right.
**ANDY LI:** We understand.

[Music Playing][Pause];[00:41:44 – 00:41:51]

**Raymond Chow:** Oh, he's been looking for an excuse to get in trouble [indicating Li]
**ANDY LI:** Huh?
**Raymond Chow:** You're looking for excuse to get in trouble
**ANDY LI:** I'm looking for an excuse to fuck some idiot up. Bugs, gotta get rid of the bugs.
**UCE-4599:** They're pretty annoying bugs.
**Raymond Chow:** No, not . . .
**ANDY LI:** You know how you eat, and like these flies fly around? The flies flying around, [Indiscernible 00:42:16] turn around you gotta smack one of 'em.
**Raymond Chow:** No, I don't need that.
**UCE-4599:** Not that you need it. Not that you need it. This is what it is. [Pause] I'm gonna say hello to Joe.

Dkt. 1059, Pages 18-19, 21-5.

35

The perverse thing about this exchange is that the Government relies heavily on the "take care of the bugs" statement by Li to support its charge of solicitation murder of Jim Tat Kong but the actual recordings reflect that Li was fed drinks and whipped into an excited frenzy about the opportunity to have a role in Chow's life and in the course of that conversation the Government perpetrated the crime which they claim Chow committed but never did.

### xiii. The Government Allowed the Public to Believe Raymond Chow Killed Allen Leung, But Never Actually Suspected Raymond Chow of Committing the Crime.

The primary event that the Government used to justify undercover operations was the murder of Allen Leung. However, the Government never set the record straight. What they did not admit and will not admit now, is that they have a suspect in the murder, one of Raymond's adversaries. They did, however, allow judges and the public to believe he committed the murder so that every search warrant application would get rubber-stamped and every news article would perpetuate this rumor. This was simply an allegation that was used to contaminate the court's opinion of Chow without providing any evidence.

### xiv. The United States Attorney Knowingly Used Untrustworthy, Cooperating Witnesses To Support the Indictment For Conspiracy to Commit Murder of Kong and the murder of Alan Leung.

The Government knows Chow and his associates did not kill Jim Tat Kong. Despite their public statements and filings, their under seal filings exonerate Chow. A minimal investigation into Kong will show that people were lined up to get rid of him as he was a predator, a drug dealer, and an organized crime figure who mysteriously alluded the FBI for a decade.  Yet, the final hour came before trial and the Government jockeyed for a continuance, they developed two star witness: Andy Li who has been labeled as not to be trusted by the Government and Individual C who cannot remember if he drove the getaway car, did the murder himself, and could not remember exactly how many people were with him when it happened. Andy Li, despite numerous previous statements to the contrary, claims Chow solicited him to hire a hitman to kill Kong. Li never got around to it. To rely on Li is to suborn perjury and the Government knows this and has all but admitted it in previous hearings.

"It would make a mockery of the system for the Court now to vest its trust in [Andy Li] by releasing him to comply with conditions after he tried to defraud this Court,"[30] wrote

---

[30] Dkt. 462, Page 9, Lines 27-28,

supervising prosecutor William Frentzen in opposing a reconsideration of Li's detention order where it was shown that Li had caused false declarations to be submitted, was able to influence a sheriff's deputy to lie on his behalf, and conspired to lie over a recorded jail line.   Frentzen also stated "It also is clear that defendant filed declarations from his wife and the Officer that he knew were false. Again, defendant's efforts to weave illogical stories with compromised witnesses demonstrate that the defendant is not straight with the Court and cannot be trusted on release."[31]

Mr. Frentzen has used Li's proffer in large part to attempt to convict Chow of the murder of Allen Leung in the public arena. Frentzen will put Andy Li on the stand in this trial, look at the jury and ask him questions which will incriminate Chow to the extent Li's false testimony is believed, but it is unknown how he will justify to the court and the profession that he offers a witness who "will say or do anything to try to get out of jail"[32] and one that has "knowingly submitted false declarations to this Court in his effort to gain release."[33] This is outrageous conduct and signifies a prosecutor who will

---

[31] Page 6, Lines 20-23.

[32] Dkt. 462, Page 3, Lines 24-26.

[33] Dkt. 462, Page 1, Lines 12-13.

compromise his values just to win. There is no room for this
conduct in any prosecution.

>    ### xv.  The FBI Predicated Its Suspicion-less Investigation on Unsupported Racist Stereotypes about Chinese-Americans.

The FBI based its investigation on the 2008 domain
assessment of Chinese communities, stating that "San Francisco
domain is home to one of the oldest Chinatown in North America
and one of the largest ethnic Chinese populations outside
mainland China," and "[w]ithin this community there has been
organized crime for generations."[34] In the Government's Affidavit
of Special Agent Emmanuel V. Pascua in Support of Complaint[35],
the Government agent alleges law enforcement's interest in the
Chee Kung Tong began in 2006 when then-Dragonhead of the tong,
Allen Leung, was murdered in San Francisco. The agent alleges
Chinese tongs "engaged in criminal activities: protecting
rackets, extortion, and strong arm methods for controlling such
tolerated vices as gambling and prostitution." Nowhere does the
Government indicate that it is interested in pursuing suspected
money laundering, or sales of stolen or counterfeit cigarettes
or liquor. These crimes were entirely fabricated by the

---

[34] Electronic communication from Fed. Bureau of Investigation, San Francisco, Oakland Resident Agency, to San Francisco (June 8, 2009) (on file with author), *available at*
[35] at page 3, footnote 1,

Government agents. There was no individualized suspicion, and the FBI leveraged the highly controversial Domain Management program to open their investigation on nothing more than a hunch.[36][37]

> ### xvi. Raymond Chow Had No Knowledge of what George Nieh and UCE 4599 Were Doing with Each Other; Yet, Chow is Charged As If He Knew the Inner Workings of Their Relationship and Took the Money as a "Fee."

On June 16, 2011, George Nieh told UCE 4599 that Raymond Chow had asked what he was doing with Jordan. Nieh told UCE 4599 that he told Raymond he was cashing checks for him. US 608269. It cannot be said that Raymond understood "cashing checks for him" meant that George Nieh was laundering money with UCE 4599. Rather, Raymond assumed, as is the reasonable assumption, that "cashing checks," meant cashing checks.

On another occasion, Nieh told Raymond that he was earning money with UCE 4599 by investing in stocks. "Nieh said he gives

---

[http://www.aclu.org/files/fbimappingfoia/20111019/ACLURM011495.pdf](http://www.aclu.org/files/fbimappingfoia/20111019/ACLURM011495.pdf) (Domain Management – Criminal; Asian-Eurasian Criminal Enterprise).

[37] It should be noted that the improper racial stereotyping of American citizens is very much a live controversy in San Francisco. The ACLU and Morrison-Foerster recently won an issue involving FBI exemptions, which may result in the release of approximately 50,000 documents from the San Francisco FBI field office pursuant to FOIA litigation indirectly linked to U.S. v. Chow. The link is indirect because it is unknown how devastating and probative to the present case those documents will be until they are turned over. Chow's contention is that they should have been turned over as Brady material as part of the discovery exchange in this case. They were requested. *See* Northern District Case No. 10-cv-03759-RS.

40

Chow a couple hundred dollars at a time and tells Chow he made money on stock."[38]

Moreover, Raymond Chow understood that the money given to him was done so out of respect to help him because he had no other source of income until his book came out. "Nieh explained [to UCE 4599] that he will give $500 to $1,000 to Chow in small amounts. Nieh explained that is a sign of paying respect to Chow."[39] Raymond never viewed these payments as a fee for allowing the UCE to work with his friends, despite UCE 4599's repeated attempts to make it appear that way.[40] How the FBI can employ a system, which fails to adequately check an undercover agent's claims about a conversation that was actually recorded by the undercover agent is unknown. What is known is that before devastating the life of Chow and his family by falsely arresting him, it would have been prudent to review the audio files to ensure UCE 4599 was being honest.

---

[38] US 608221.

[39] US 608206.

[40]   Actual audio conversation on 1D310 (first of two recordings) at 28:47, where Raymond tells UCE 4599 "You don't owe me anything!"

41

***xvii. Despite Raymond Chow's Refusal to Participate in Any of UCE 4599's Crimes, UCE 4599 Relentlessly Surrounded Chow With Crime Then Stated Chow Was At The Leader of the Enterprise.***

The Government purports that Raymond Chow was the leader of a vast criminal network because Raymond introduced UCE 4599 to a number of people who would later became involved in the crimes created by UCE 4599. In reality, Raymond Chow introduced UCE 4599 to scores of people over the course of the investigation, had not been made aware that for several years the UCE was engaged in illegal conduct with Nieh, Chiu, Siu, Pau, Yun, Li, or Chanthavong.

Despite a lack of any evidence suggesting Chow administered the Enterprise, When Raymond Chow was arrested, he was brought into a room at the federal building, and put into a chair in the center of a large circle of chairs. Each one of Raymond Chow's co-defendants was marched into the room to sit in the chairs surrounding Raymond Chow in a circle facing inward toward Chow. The message was clear: Raymond Chow was the only man they truly wanted.

> ### xviii. UCE 4599 Initiated the Liquor Transaction under the Guise That It Was a Legitimate Transaction to Get Raymond Chow Involved, Then at the Last Minute Revealed That the Liquor Was Stolen.

Raymond Chow truly believed UCE had connections at Hennessy and in the bottling industry, as that is what he was told by the undercover agents during the fishing trip in Hawaii, and according to Raymond Chow on other occasions as well. It was upon this belief that Raymond kicked his connections in China into action - Tina and Jane Liang. Raymond, while under that misguided belief that the liquor was legal, convinced Tina and Jane that the liquor was genuine, not counterfeit as they were suspecting. It was only after these occurrences that Raymond learned that UCE 4599's liquor was stolen. By this point, he had put his reputation on the line with a wealthy and powerful family in China. On February 16, 2012, "The UCE informed Chow he was only able to provide 50 cases of liquor because he couldn't 'sit' on the liquor."[41]

Raymond Chow was skillfully led into a compromising situation, where he was left with the decision of going along with the project that had taken so much time and effort to get going, or face the shame of admitting to his friends in China

---

[41] US 608513.

43

that he had not known a basic and important factor in the transaction - that the liquor was stolen. Luckily, Raymond had not formed the required criminal intent at the time of the agreement.

> ### xix. Many Audio Recordings That Allegedly Contain Some of the Most Incriminating Statements Are Either Missing or Nonexistent.

Only a small sampling of Statements attributed to Raymond Chow, which the audio recordings either do not exist, or are missing include:

- "Chow whispered to [UCE 4599] that he 'knew of and approved of all criminal activity' in his organization." (Complaint Affidavit at 18 lines 12-17)

- "On May 2, 2012, Chow was intercepted talking with Nieh about whom to steer UCE 4599 to within the organization to launder money." (Complaint Affidavit at 48, lines 23-24)

- "Chow said if they drove UCE 4599 away, they would just make less money." (Complaint Affidavit at 48, lines 23-24)

- "CHOW said that if he got ratted out, he would claim that he had only introduced the relationship, and that he did not know what they were doing." (Complaint Affidavit at 35, lines 3-4)

### xix. The Government Promised Chow a New Identity and the Right to Work but Instead of Honoring That Promise They Launched Operation White Suit.

Raymond Chow sued the United States twice to enforce his 2002 plea agreement.[42] As we now know, the FBI had no qualms about lying to judges about Raymond Chow as well.  There is not a sworn affidavit in this entire case that tells the truth about Raymond's life from 2002 forward.  The applications these agents signed under penalty of perjury and placed in front of federal judges in San Francisco, amount to flat out perjury.

They never mention to any judge that Raymond was so intent on reforming himself that when the Government backed out on their promise to provide Raymond with the right to work and to get him his new identity, Raymond Chow sued the United States Government for specific performance.[43]  In front of Judge Jenson, the US Attorney agreed that "absent a further showing by the FBI" the S-Visa "should be put back on track." It never was. Brian Stretch now runs the Northern District; yet, he does not have the courage to intervene and right this wrong. Then again this is not the only wrong of which Mr. Stretch is complicit.

---

[42] See CR 92-2060 presently under seal. Chow filed motions to compel specific performance both in 2005 and in 2007.

[43] Raymond Chow, a.k.a.Kwok Cheung Chow v. Michael Chertoff, Secretary, Department of Homeland Security, et al., No. C-05-2970 MJJ; See Also CR 92-2060 DLJ Petition for Habeas Corpus, or 28 USC 2255 Motion, or Motion to Enforce Specific Performance of Plea Agreement and for Temporary Stay of Deportation Order, filed by Raymond Chow under seal in 2005.

As Raymond remained steadfast in his commitment to survive lawfully the FBI spent millions trying to ensnare him in crime. Raymond spent years of his life trying to keep his Tong safe and away from crime and it was the Government who tried to encourage it. This operation was always about the end goal and every single agent and prosecutor went blind while staring at it for so long. This is how the holocaust happened. Evil prevails when good men and women do nothing.

The ultimate blow to their own dignity and the move that says the most about the character and quality of federal prosecutions is that they lied to the public and expected to get away with it. The Government was so certain that Raymond Chow would plea out instead of go to trial they lied about everything he said despite the fact it was they who recorded it.  The complaint in support of indictment had lie after lie in it ranging from accusations that Raymond willingly took the money, to allegations that he planned and conspired with George Nieh, to lies that he ran a racketeering enterprise. It was all a lie. This was the FBI sitting at a poker table after a decade long run of breaking even at best; tired and desperate, instead of folding, they pushed all of taxpayers' dollars into the center of the table.

## CONCLUSION

The United States of America has within its borders some of the most intelligent, finest, and courageous people in its ranks of federal law enforcement and prosecution. Our federal ranks are not immune in The Battle of Good and Evil. A cancer has formed and it must be removed.

Operation White Suit is more than isolated misconduct contained within a prosecution that was thrust forward year after year from the momentum of bureaucracy. The real danger in this prosecution is that when agents and prosecutors should have had the courage to stop the runaway train, even the least culpable turned their backs, a symptom that a culture of apathy and corruption has taken hold. Apparently agents and prosecutors' pre-conceptions about Chow outweighed the values, which they are commissioned to protect.  To them, the risk was worth it.

They sold out the American citizen by dishonoring core principles of democracy and ethical law enforcement. This was never about public safety, and this was never about bringing just consequences upon a criminal. In the course of advancing whatever agenda was being advanced here, the Government became the criminal. The United States Attorney proved to the public that any trust in the federal prosecution mechanism is misplaced because the most obvious forms of corruption avoided prosecution

47

thanks to a superior form of political corruption that unless somehow checked is alive and well in San Francisco.

The expectation that a victim be complicit in keeping a predator's secret is what damages long after the physical wounds heal. Here, agents and prosecutors knew hundreds of attorneys would work on this case, review discovery, and advocate for their clients, yet they turned over all of this information in discovery as a matter of convenience to themselves and not a matter of obligation. Just as a child's abuser establishes psychological control over his victim through fear and intimidation long before the first horrific physical act takes place the abuser initially finds comfort in the Secret but eventually finds the true power is in the act of keeping the Secret. The boldness of it all brings the disgust and disdain years later unraveling lives for generations. That is what nearly happened here.

A congressional inquiry should ensue into this Operation if the American public is to be free from pervasive misconduct in the future. However, until that occurs, there is only one way the court can remain free from complicity with the criminals and the cowards within the ranks of our nation's finest. The Court must destroy the Secret. For the foregoing reasons this motion should be granted.

Dated: November 4, 2015

                                        Respectfully submitted,

                                        /s/ CURTIS BRIGGS
                                        CURTIS BRIGGS
                                        J. TONY SERRA
                                        TYLER SMITH
                                        Attorneys for Defendant
                                        KWOK CHEUNG CHOW

49

## DECLARATION OF COUNSEL

I, CURTIS BRIGGS, declare:

1. I am an attorney licensed to practice in the State of California, and counsel of record for defendant KWOK CHEUNG CHOW herein.

2. The statements in the accompanying MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT CONDUCT are true and correct to the best of my knowledge, based on my information and belief.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of November, at San Francisco, California.

/s/ Curtis L. Briggs
CURTIS BRIGGS
