BRIAN J. STRETCH (CABN 163973)
Acting United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

WILLIAM FRENTZEN (LABN 24421)
SUSAN E. BADGER (CABN 124365)
S. WAQAR HASIB (CABN 234818)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    William.frentzen@usdoj.gov
    Susan.badger@usdoj.gov
    Waqar.hasib@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.: CR 14-0196 CRB |
| v. | UNITED STATES' OPPOSITION TO MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT |
| KWOK CHEUNG CHOW, et al. | |
| Defendants. | Court:  Honorable Charles R. Breyer |

## I. INTRODUCTION

The defendant filed an eleventh hour claim of outrageous government misconduct. That motion is devoid of legal merit and is factually inaccurate. It should be promptly denied without a hearing.

## II. ARGUMENT

### A. DEFENDANT'S CLAIM IS MERITLESS

A claim of outrageous government conduct "is not a defense, but rather a claim that government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed." *United States v. Montoya*, 45 F.3d 1286, 1300 (9th Cir. 1995), *citing Hampton v. United States*, 425 U.S. 484 (1976), *United States v. Russell*, 411 U.S. 423, 431-32 (1973). "Outrageous government conduct occurs when the actions of law enforcement officers or informants 'are so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013), *citing Russell, supra*, 411 U.S. at 431-32. "Dismissing an indictment for outrageous government conduct, however, is 'limited to extreme cases' in which the defendant can demonstrate that the government's conduct 'violates fundamental fairness' and is 'so grossly shocking and so outrageous as to violate the universal sense of justice.'" *Black, supra*, at 302, *citing United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011).

In *Black*, the Ninth Circuit stated that "[t]his is an extremely high standard," [citations omitted] and observed that "there are only two reported decisions in which federal appellate courts have reversed convictions under this doctrine." *Id., citing United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971). In *Black*, the Court noted that it had previously found that it is outrageous conduct for the government to engineer and direct a criminal enterprise from start to finish, or to use excessive physical or mental coercion to convince an individual to commit a crime. *Black*, at 302. On the other hand, the Court said that it is not outrageous to infiltrate a criminal organization, approach individuals who are already involved in or contemplating a criminal act, or provide necessary items to a conspiracy. *Id*. "Nor is it outrageous for the government to use artifice and stratagem to ferret out criminal activity." *Id*.

The *Black* opinion spelled out some factors to analyze when a claim of outrageous misconduct is made. *Id.* at 303.  Here, Chow cannot demonstrate that any of the factors, let alone all of them collectively, warrant dismissal.

- ■ *Individualized suspicion.* The Black opinion made it clear this is not necessary, but it is a factor. *Id*. The government had individualized suspicion regarding Chow and his associates for a lengthy period of time. In 2005, the FBI withdrew its support for Chow's release on conditions from ICE custody due to individualized suspicion of criminal activity. Following the murder of Allen Leung, an AUSA who is no longer with the U.S. Attorney's Office opened a file on Raymond Chow and an associate, and that file remained open until the present. The government, therefore, had an individualized suspicion that Chow and his associates were engaged in criminal activity. In 2007-2008, the government in the Northern District of California as well as the Eastern District of California and the District of Colorado obtained Court authorized wiretaps and developed a large amount of evidence of drug dealing by Hop Sing Tong members associated with Chow, including some of the cooperators in the current case. As a result, 19 defendants in the Northern District of California were charged and convicted of narcotics trafficking and firearms offenses in "Operation Triplestack" (*United States v. Chayasith, et. al.*).

- ■ *Known criminal characteristics of defendants.* With few exceptions, the defendants in this case had prior criminal convictions. Certainly, Chow has a long history of criminal conduct. In part, it is Chow's prior criminal conduct that made clear that – as a career criminal in a wide variety of criminal endeavors – he was fully aware that his associates were actively involved in criminal activity on behalf of the Chee Kung Tong and Hop Sing Tong, rather than naively being merely present. Each and every defendant in the case openly discussed criminal activity independent of the undercover agent on numerous occasions. Searches revealed drugs, guns, and cash proceeds that had nothing to do with the undercover agent. Further, many searches turned up indicia associating that defendant with Chow and the Chee Kung Tong. Some potential targets were turned away or not charged simply because the government was discerning in its selection of the real criminal actors in the organization.

The Court should consider that, so far, every defendant who was facing the instant trial other than Chow entered guilty pleas to a large number of criminal offenses, or to a large number of criminal acts charged through a racketeering charge. So far, approximately 13 defendants have already entered guilty pleas. If these were innocent bystanders ensnared into a governmental conspiracy to railroad them, their skilled attorneys would have filed a motion similar in nature to the one filed by Chow. They did not because Chow's motion is entirely without merit.

- *Government's role in creating the crime.* As in many undercover operations, the government had to propose certain criminal activities in order to penetrate into the criminal organization. Once penetrated and developing trust, however, Chow and his associates described their own criminal activities and eventually brought opportunities to the undercover agents. It was Chow who relatively quickly proposed illegal alcohol deals with his associates and facilitated the undercover agent's meetings with potential buyers for purportedly stolen alcohol. Once the relationship was established, Chow and his associates began in earnest to bring criminal opportunities to the undercover agent. Those opportunities included requesting assistance in laundering money from narcotics trafficking from the East coast to the West coast in amounts of hundreds of thousands of dollars monthly. Further, the undercover agent had no role in creating Chow's crimes of murder and conspiracy to commit murder – which were not fully discovered until the undercover penetrated the organization and members began to cooperate with the government.

- *The government's encouragement of the defendants to commit the offense conduct.* Once it was known that the undercover agent was a high level and relatively sophisticated criminal, Chow and his associates flocked to the agent to share in the opportunities. No encouragement was needed. While the undercover agent was certainly aggressive at times in trying to determine who was involved in the schemes and who was pulling the strings in the organization, that is no different than investigation of any crime where the structure of the organization is set up to insulate high level members from direct interaction with perceived risky partners – which the undercover was at times. This factor is not present here.

- *The nature of the government's participation in the offense conduct.* The government provided opportunities to commit crimes to the defendants and they gladly accepted those opportunities. The government provided alcohol, money, and cigarettes, but the defendants were already proposing other criminal endeavors which could not be carried out by the government – such as providing narcotics or transporting the defendants' narcotics. The means selected by the government increased the ability of the government to infiltrate the organization without committing potentially unacceptable criminal conduct itself. To that end, reverse money laundering – that is, providing the opportunity for defendants to launder the undercover agent's purported illegal cash -- was a perfect entry point because the act of laundering fictitiously dirty money does no societal harm. While cheap booze and cigarettes may be questionable to some, they are legal products and the government dealt in legitimate products and not counterfeit or knock off products that could be any more harmful than alcohol and cigarettes already are.

- *The nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.* Here, the government faced an organization that was varied in its criminal nature. During the course of the investigation, the defendants discussed committing crimes from narcotics trafficking, money laundering, extortionate collections, pimping, assaults, and, eventually, murder. These are clearly crimes that demand investigation. The nature of the organization was one that was extremely paranoid and difficult to infiltrate. Chow sent several different associates – Kevin Siu, Allen Chiu, George Nieh, and others – to work with the undercover agent and pretend that Chow had no knowledge or role in the cooperation to see whether or not they would be arrested. The members of the organization, including Chow, were constantly testing the undercover to try to determine if he was a cop or a snitch. In that regard, he was felt for wires, threatened, investigated, questioned, and consistently fed misinformation by Chow and his associates. Chow and his closest associates openly discussed whether the undercover agent was a cop or a snitch amongst themselves (intercepted by wiretap) or in front of the undercover agent (in

Cantonese and in English). The means adopted were the sole manner of fully infiltrating the organization.

In short, defendant Chow's last minute attempt to gain a dismissal of the charges against him is factually, and therefore, legally untenable. This was not an outrageous investigation. What was outrageous was the number of criminal actors who followed Chow, surrounded and supported him on a daily basis, and who flocked to the invitation to engage in criminal activity once Chow proclaimed the undercover agents to be "good and loyal brothers" for whom Chow professed love. Chow's word of approval for men he believed to be unrepentant gangsters and criminals was sufficient for those in his organization to go to them like moths to a flame. Chow's associates included Keith Jackson, an honorary member of the Chee Kung Tong who lauded Chow at an annual Chee Kung Tong function. Jackson actively encouraged the undercover agents not only to assist him in engaging in political corruption with State Senator Leland Yee, but also to engage in narcotics and firearms trafficking and, eventually, in a conspiracy with Yee to engage in international arms trafficking. Chow was the entry point to a cesspool of criminal association unrivaled in recent memory in this District. That was not due to the activity of the undercover agents and the government, but it was due to Chow – a ruthless and completely unrehabilitated criminal – and his selection of "good and loyal brothers and sisters" with whom he chose to surround himself. The instant undercover investigation merely uncovered those associations.

To the extent that Chow's motion claims that the recordings of him and others have been misrepresented, he is incorrect. Worse, Chow makes false statements himself to try to cloud the issue.[1] His claim is also non-sensical. The government recorded virtually all of its interactions with Chow and his associates. The notion that the government would purposely misrepresent the very recordings that it made and preserved makes no sense.

---

[1] For example, Chow claims that the undercover agent fabricated Chow offering to introduce the undercover agent to people controlling ports in Mexico. Def.'s Mot. at 31-32. However, the offer to make that introduction by Chow was not only captured on the recording, it was captured several times. See recording 1D151. Chow's inability to listen to the recorded conversation does not make the undercover agent a liar. In any event, Chow's claim, even if it were correct, is that the undercover agent – who knows he is wearing a recording device – was lying to another agent about a conversation he had just had with Chow and who would later be listening to the recording himself. How Chow can claim that this fits the legal doctrine of outrageous governmental misconduct – other than to another agent – is confusing to say the least.

USA OPP. TO MOT. TO DISMISS
CR 14-0196 CRB                                     5

B.  DEFENDANT'S CLAIM IS UNTIMELY

A motion to dismiss an indictment alleging outrageous government conduct is a question of law directed to the trial judge.  *United States v. Bogart*, 783 F.2d 1428, 1431 (9th Cir.) , *vacated on other grounds with respect to one defendant sub nom., United States v. Wingender*, 790 F.2d 802 (9th Cir. 1986).  In the instant case, this Court ordered the defendants to file any Rule 12 motions to dismiss for hearing on September 9, 2015.  All defendants agreed to that timetable and all defendants other than Chow adhered to that timetable.  No defendant filed a motion to dismiss on grounds of outrageous government conduct; accordingly, the issue is waived.  From the fact that no defendant filed such a motion, one can reasonably assume that each defendant came to the conclusion that there were no meritorious claims to be made in that regard.

Instead of following the Court's order and with no valid reason for late filing presented to the Court, Chow elected to file the instant motion to dismiss after jury selection.  Undoubtedly, Chow and his counsel understood that the motion lacked any merit.  It appears that they chose to file the motion at a time when it might give rise to interest from, and valuable coverage in, the media.  Chow's motion should be denied as untimely.

### III.  CONCLUSION

For the reasons stated above, the government hereby respectfully requests that the Court deny defendant's Motion to Dismiss without further hearing.

DATED: November 16, 2015                    Respectfully submitted,

BRIAN J. STRETCH
Acting United States Attorney

              /s/
SUSAN E. BADGER
WILLIAM FRENTZEN
S. WAQAR HASIB
Assistant United States Attorneys